## AARON *v.* SECURITIES AND EXCHANGE COMMISSION

No. 79–66.   Argued February 25, 1980—Decided June 2, 1980

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 702. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, and MARSHALL, JJ., joined, *post*, p. 703.

*Barry M. Fallick* argued the cause and filed briefs for petitioner.

*Ralph C. Ferrara* argued the cause for respondent. With him on the briefs were *Solicitor General McCree, Deputy Solicitor General Geller, Stephen M. Shapiro, Paul Gonson,* and *Jacob H. Stillman.**

---

*Briefs of *amici curiae* urging reversal were filed by *John M. Cannon* for the Mid-America Legal Foundation; by *Kenneth J. Bialkin* and *Louis*

MR. JUSTICE STEWART delivered the opinion of the Court.

The issue in this case is whether the Securities and Exchange Commission (Commission) is required to establish scienter as an element of a civil enforcement action to enjoin violations of § 17 (a) of the Securities Act of 1933 (1933 Act), § 10 (b) of the Securities Exchange Act of 1934 (1934 Act), and Commission Rule 10b–5 promulgated under that section of the 1934 Act.

I

When the events giving rise to this enforcement proceeding occurred, the petitioner was a managerial employee at E. L. Aaron & Co. (the firm), a registered broker-dealer with its principal office in New York City. Among other responsibilities at the firm, the petitioner was charged with supervising the sales made by its registered representatives and maintaining the so-called "due diligence" files for those securities in which the firm served as a market maker. One such security was the common stock of Lawn-A-Mat Chemical & Equipment Corp. (Lawn-A-Mat), a company engaged in the business of selling lawn-care franchises and supplying its franchisees with products and equipment.

Between November 1974 and September 1975, two registered representatives of the firm, Norman Schreiber and Donald Jacobson, conducted a sales campaign in which they repeatedly made false and misleading statements in an effort to solicit orders for the purchase of Lawn-A-Mat common stock. During the course of this promotion, Schreiber and Jacobson informed prospective investors that Lawn-A-Mat was planning or in the process of manufacturing a new type of small car and tractor, and that the car would be marketed within six weeks. Lawn-A-Mat, however, had no such plans. The two registered representatives also made projections of

A. Craco for the American Institute of Certified Public Accountants; and by Milton V. Freeman, Werner Kronstein, and Richard O. Scribner for the Securities Industry Association.

substantial increases in the price of Lawn-A-Mat common stock and optimistic statements concerning the company's financial condition. These projections and statements were without basis in fact, since Lawn-A-Mat was losing money during the relevant period.

Upon receiving several complaints from prospective investors, an officer of Lawn-A-Mat informed Schreiber and Jacobson that their statements were false and misleading and requested them to cease making such statements. This request went unheeded.

Thereafter, Milton Kean, an attorney representing Lawn-A-Mat, communicated with the petitioner twice by telephone. In these conversations, Kean informed the petitioner that Schreiber and Jacobson were making false and misleading statements and described the substance of what they were saying. The petitioner, in addition to being so informed by Kean, had reason to know that the statements were false, since he knew that the reports in Lawn-A-Mat's due diligence file indicated a deteriorating financial condition and revealed no plans for manufacturing a new car and tractor. Although assuring Kean that the misrepresentations would cease, the petitioner took no affirmative steps to prevent their recurrence. The petitioner's only response to the telephone calls was to inform Jacobson of Kean's complaint and to direct him to communicate with Kean. Otherwise, the petitioner did nothing to prevent the two registered representatives under his direct supervision from continuing to make false and misleading statements in promoting Lawn-A-Mat common stock.

In February 1976, the Commission filed a complaint in the District Court for the Southern District of New York against the petitioner and seven other defendants in connection with the offer and sale of Lawn-A-Mat common stock. In seeking preliminary and final injunctive relief pursuant to § 20 (b) of the 1933 Act and § 21 (d) of the 1934 Act, the Commission alleged that the petitioner had violated and aided and abetted

violations of three provisions—§ 17 (a) of the 1933 Act, § 10 (b) of the 1934 Act, and Commission Rule 10b–5 promulgated under that section of the 1934 Act.[1] The gravamen of the charges against the petitioner was that he knew or had reason to know that the employees under his supervision were engaged in fraudulent practices, but failed to take adequate steps to prevent those practices from continuing. Before commencement of the trial, all the defendants except the petitioner consented to the entry of permanent injunctions against them.

Following a bench trial, the District Court found that the petitioner had violated and aided and abetted violations of § 17 (a), § 10 (b), and Rule 10b–5 during the Lawn-A-Mat sales campaign and enjoined him from future violations of these provisions.[2] The District Court's finding of past violations was based upon its factual finding that the petitioner had intentionally failed to discharge his supervisory responsibility to stop Schreiber and Jacobson from making statements to prospective investors that the petitioner knew to be false and misleading. Although noting that negligence alone might suffice to establish a violation of the relevant provisions in a Commission enforcement action, the District Court concluded that the fact that the petitioner "intentionally failed to terminate the false and misleading statements made by Schreiber and Jacobson, knowing them to be fraudulent, is sufficient to establish his scienter under the securities laws." As to the remedy, even though the firm had since gone bankrupt and the petitioner was no longer working for a broker-

---

[1] The Commission also charged the petitioner and three other defendants with violations of the registration provisions of §§ 5 (a), (c) of the 1933 Act, 15 U. S. C. §§ 77e (a), (c). The District Court found that the petitioner had violated these provisions and enjoined him from future violations. The Court of Appeals affirmed this holding, and the petitioner has not challenged this portion of the Court of Appeals' decision.

[2] The opinion of the District Court is reported in CCH Fed. Sec. L. Rep. ¶ 96,043 (1977).

dealer, the District Court reasoned that injunctive relief was warranted in light of "the nature and extent of the violations . . . , the [petitioner's] failure to recognize the wrongful nature of his conduct and the likelihood of the [petitioner's] repeating his violative conduct."

The Court of Appeals for the Second Circuit affirmed the judgment. 605 F. 2d 612. Declining to reach the question whether the petitioner's conduct would support a finding of scienter, the Court of Appeals held instead that when the Commission is seeking injunctive relief, "proof of negligence alone will suffice" to establish a violation of § 17 (a), § 10 (b), and Rule 10b–5. *Id.*, at 619. With regard to § 10 (b) and Rule 10b–5, the Court of Appeals noted that this Court's opinion in *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, which held that an allegation of scienter is necessary to state a private cause of action for damages under § 10 (b) and Rule 10b–5, had expressly reserved the question whether scienter must be alleged in a suit for injunctive relief brought by the Commission. *Id.*, at 194, n. 12. The conclusion of the Court of Appeals that the scienter requirement of *Hochfelder* does not apply to Commission enforcement proceedings was said to find support in the language of § 10 (b), the legislative history of the 1934 Act, the relationship between § 10 (b) and the overall enforcement scheme of the securities laws, and the "compelling distinctions between private damage actions and government injunction actions." [3] For its holding that sci-

---

[3] The Court of Appeals observed that its previous decisions had required scienter in private damages actions under § 10 (b) even before this Court's decision in the *Hochfelder* case, but also had "uniformly . . . held that the language and history of the section [did] not require a showing of scienter in an injunction enforcement action brought by the Commission." 605 F. 2d, at 620–621. This distinction had been premised on the fact that the two types of suits under § 10 (b) advance different goals: actions for damages are designed to provide compensation to individual investors, whereas suits for injunctive relief serve to provide maximum protection for the investing public. In the present case, the Court of Appeals, relying on its

enter is not a necessary element in a Commission injunctive action to enforce § 17 (a), the Court of Appeals relied on its earlier decision in *SEC* v. *Coven,* 581 F. 2d 1020 (1978). There that court had noted that the language of § 17 (a) contains nothing to suggest a requirement of intent and that, in enacting § 17 (a), Congress had considered a scienter requirement, but instead "opted for liability without willfulness, intent to defraud, or the like." *Id.,* at 1027–1028.[4] Finally, the Court of Appeals affirmed the District Court's holding that, under all the facts and circumstances of this case, the Commission was entitled to injunctive relief. 605 F. 2d, at 623–624.

We granted certiorari to resolve the conflict in the federal courts as to whether the Commission is required to establish scienter—an intent on the part of the defendant to deceive, manipulate, or defraud[5]—as an element of a Commission enforcement action to enjoin violations of § 17 (a),[6] § 10 (b), and Rule 10b–5.[7] 444 U. S. 914.

reasoning in previous cases, concluded that "[i]n view of the policy considerations underlying the securities acts, . . . the increased effectiveness of government enforcement actions predicated on a showing of negligence alone outweigh[s] the danger of potential harm to those enjoined from violating the securities laws." *Id.,* at 621.

[4] Neither the District Court nor the Court of Appeals gave any indication of which subsection or subsections of § 17 (a) of the 1933 Act the petitioner had violated.

[5] The term "scienter" is used throughout this opinion, as it was in *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 194, n. 12, to refer to "a mental state embracing intent to deceive, manipulate, or defraud." We have no occasion here to address the question, reserved in *Hochfelder, ibid.,* whether, under some circumstances, scienter may also include reckless behavior.

[6] Compare, *e. g.,* the present case, and *SEC* v. *Coven,* 581 F. 2d 1020 (CA2 1978) (scienter not required in Commission enforcement action under §§ 17 (a)(1)–(3)), with *Steadman* v. *SEC,* 603 F. 2d 1126 (CA5 1979) (scienter required in Commission disciplinary action under § 17 (a)(1), but not under §§ 17 (a)(2)–(3)), and with *SEC* v. *Cenco Inc.,* 436

## II

The two substantive statutory provisions at issue here are § 17 (a) of the 1933 Act, 48 Stat. 84, as amended, 15 U. S. C. § 77q (a), and § 10 (b) of the 1934 Act, 48 Stat. 891, 15 U. S. C. § 78j (b). Section 17 (a), which applies only to sellers, provides:

> "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> "(1) to employ any device, scheme, or artifice to defraud, or
>
> "(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Section 10 (b), which applies to both buyers and sellers, makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Pursuant to its rulemaking

---

F. Supp. 193 (ND Ill. 1977) (scienter required in Commission enforcement action under §§ 17 (a)(1)–(3)).

[7] Compare, e. g., the present case, and *SEC* v. *World Radio Mission, Inc.*, 544 F. 2d 535 (CA1 1976) (scienter not required in Commission enforcement action under § 10 (b) and Rule 10b–5), with *SEC* v. *Blatt*, 583 F. 2d 1325 (CA5 1978) (scienter required in Commission enforcement action under § 10 (b) and Rule 10b–5).

power under this section, the Commission promulgated Rule 10b–5, which now provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b–5 (1979).

The civil enforcement mechanism for these provisions consists of both express and implied remedies. One express remedy is a suit by the Commission for injunctive relief. Section 20 (b) of the 1933 Act, 48 Stat. 86, as amended, as set forth in 15 U. S. C. § 77t (b), provides:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter [e. g., § 17 (a)], or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

Similarly, § 21 (d) of the 1934 Act, 48 Stat. 900, as amended, 15 U. S. C. § 78u (d), authorizes the Commission to seek injunctive relief whenever it appears that a person "is engaged or is about to engage in acts or practices constituting"

a violation of the 1934 Act (*e. g.,* § 10 (b)), or regulations promulgated thereto (*e. g.,* Rule 10b–5), and requires a district court "upon a proper showing" to grant injunctive relief.

Another facet of civil enforcement is a private cause of action for money damages. This remedy, unlike the Commission injunctive action, is not expressly authorized by statute, but rather has been judicially implied. See *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 196–197. Although this Court has repeatedly assumed the existence of an implied cause of action under § 10 (b) and Rule 10b–5, see *Ernst & Ernst* v. *Hochfelder, supra; Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 730; *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 150–154; *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 13, n. 9, it has not had occasion to address the question whether a private cause of action exists under § 17 (a). See *Blue Chip Stamps* v. *Manor Drug Stores, supra,* at 733, n. 6.

The issue here is whether the Commission in seeking injunctive relief either under § 20 (b) for violations of § 17 (a), or under § 21 (d) for violations of § 10 (b) or Rule 10b–5, is required to establish scienter. Resolution of that issue could depend upon (1) the substantive provisions of § 17 (a), § 10 (b), and Rule 10b–5, or (2) the statutory provisions authorizing injunctive relief "upon a proper showing," § 20 (b) and § 21 (d). We turn to an examination of each to determine the extent to which they may require proof of scienter.

A

In determining whether scienter is a necessary element of a violation of § 10 (b) and Rule 10b–5, we do not write on a clean slate. Rather, the starting point for our inquiry is *Ernst & Ernst* v. *Hochfelder, supra,* a case in which the Court concluded that a private cause of action for damages will not lie under § 10 (b) and Rule 10b–5 in the absence of an allegation of scienter. Although the issue presented in the

present case was expressly reserved in *Hochfelder, supra,* at 193, n. 12, we nonetheless must be guided by the reasoning of that decision.

The conclusion in *Hochfelder* that allegations of simple negligence could not sustain a private cause of action for damages under § 10 (b) and Rule 10b–5 rested on several grounds. The most important was the plain meaning of the language of § 10 (b). It was the view of the Court that the terms "manipulative," "device," and "contrivance"—whether given their commonly accepted meaning or read as terms of art—quite clearly evinced a congressional intent to proscribe only "knowing or intentional misconduct." 425 U. S., at 197–199. This meaning, in fact, was thought to be so unambiguous as to suggest that "further inquiry may be unnecessary." *Id.,* at 201.

The Court in *Hochfelder* nonetheless found additional support for its holding in both the legislative history of § 10 (b) and the structure of the civil liability provisions in the 1933 and 1934 Acts. The legislative history, though "bereft of any explicit explanation of Congress' intent," contained "no indication . . . that § 10 (b) was intended to proscribe conduct not involving scienter." *Id.,* at 201–202. Rather, as the Court noted, a spokesman for the drafters of the predecessor of § 10 (b) described its function as a " 'catch-all clause to prevent manipulative devices.' " *Id.,* at 202. This description, as well as various passages in the Committee Reports concerning the evils to which the 1934 Act was directed, evidenced a purpose to proscribe only knowing or intentional misconduct. Moreover, with regard to the structure of the 1933 and 1934 Acts, the Court observed that in each instance in which Congress had expressly created civil liability, it had specified the standard of liability. To premise civil liability under § 10 (b) on merely negligent conduct, the Court concluded, would run counter to the fact that wherever Congress intended to accomplish that result, it said so expressly and subjected such actions to significant procedural restraints not applicable to § 10 (b).

*Id.*, at 206–211. Finally, since the Commission's rulemaking power was necessarily limited by the ambit of its statutory authority, the Court reasoned that Rule 10b–5 must likewise be restricted to conduct involving scienter.[8]

In our view, the rationale of *Hochfelder* ineluctably leads to the conclusion that scienter is an element of a violation of § 10 (b) and Rule 10b–5, regardless of the identity of the plaintiff or the nature of the relief sought. Two of the three factors relied upon in *Hochfelder*—the language of § 10 (b) and its legislative history—are applicable whenever a violation of § 10 (b) or Rule 10b–5 is alleged, whether in a private cause of action for damages or in a Commission injunctive action under § 21 (d).[9] In fact, since *Hochfelder* involved an implied cause of action that was not within the contemplation of the Congress that enacted § 10 (b), *id.*, at 196, it would be quite anomalous in a case like the present one, involving as it does the express remedy Congress created for § 10 (b) violations, not to attach at least as much significance to the fact that the statutory language and its legislative history support a scienter requirement.

The Commission argues that *Hochfelder,* which involved a private cause of action for damages, is not a proper guide in construing § 10 (b) in the present context of a Commission enforcement action for injunctive relief. We are urged instead to look to *SEC* v. *Capital Gains Research Bureau, 375* U. S.

---

[8] The Court in *Hochfelder* also found support for its conclusion as to the scope of Rule 10b–5 in the fact that the administrative history revealed that "when the Commission adopted the Rule it was intended to apply only to activities that involved scienter." 425 U. S., at 212.

[9] The third factor—the structure of civil liability provisions in the 1933 and 1934 Acts—obviously has no applicability in a case involving injunctive relief. It is evident, however, that the third factor was not determinative in *Hochfelder.* Rather, the Court in *Hochfelder* clearly indicated that the language of the statute, which is applicable here, was sufficient, standing alone, to support the Court's conclusion that scienter is required in a private damages action under § 10 (b). *Id.*, at 201.

180.   That case involved a suit by the Commission for injunctive relief to enforce the prohibition in § 206 (2) of the Investment Advisers Act of 1940, 15 U. S. C. § 80b-6, against any act or practice of an investment adviser that "operates as a fraud or deceit upon any client or prospective client."   The injunction sought in *Capital Gains* was to compel disclosure of a practice known as "scalping," whereby an investment adviser purchases shares of a given security for his own account shortly before recommending the security to investors as a long-term investment, and then promptly sells the shares at a profit upon the rise in their market value following the recommendation.

The issue in *Capital Gains* was whether in an action for injunctive relief for violations of § 206 (2) [10] the Commission must prove that the defendant acted with an intent to defraud. The Court held that a showing of intent was not required. This conclusion rested upon the fact that the legislative history revealed that the "Investment Advisers Act of 1940 . . . reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which

---

[10] The statutory provision authorizing injunctive relief involved in the *Capital Gains* case was § 209 (e) of the Investment Advisors Act, 15 U. S. C. § 80b-9 (e), which provides in relevant part:

"Whenever it shall appear to the Commission that any person has engaged, is engaged, or is about to engage in any act or practice constituting a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, . . . it may in its discretion bring an action in the proper district court of the United States . . . to enjoin such acts or practices and to enforce compliance with this subchapter or any rule, regulation, or order hereunder.   Upon a showing that such person has engaged, is engaged, or is about to engage in any such act or practice, . . . a permanent or temporary injunction or decree or restraining order shall be granted without bond."

was not disinterested." 375 U. S., at 191–192 (footnote omitted). To require proof of intent, the Court reasoned, would run counter to the expressed intent of Congress.

The Court added that its conclusion was "not in derogation of the common law of fraud." *Id.*, at 192. Although recognizing that intent to defraud was a necessary element at common law to recover money damages for fraud in an arm's-length transaction, the Court emphasized that the Commission's action was not a suit for damages, but rather a suit for an injunction in which the relief sought was the "mild prophylactic" of requiring a fiduciary to disclose his transactions in stocks he was recommending to his clients. *Id.*, at 193. The Court observed that it was not necessary in a suit for "equitable or prophylactic relief" to establish intent, for "[f]raud has a broader meaning in equity [than at law] and intention to defraud or to misrepresent is not a necessary element." *Ibid.*, quoting W. De Funiak, Handbook of Modern Equity 235 (2d ed. 1956). Moreover, it was not necessary, the Court said, in a suit against a fiduciary such as an investment adviser, to establish all the elements of fraud that would be required in a suit against a party to an arm's-length transaction. Finally, the Court took cognizance of a "growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue." 375 U. S., at 194. Unwilling to assume that Congress was unaware of these developments at common law, the Court concluded that they "reinforce[d]" its holding that Congress had not sought to require a showing of intent in actions to enjoin violations of § 206 (2). *Id.*, at 195.

The Commission argues that the emphasis in *Capital Gains* upon the distinction between fraud at law and in equity should guide a construction of § 10 (b) in this suit for injunctive

relief.[11]   We cannot, however, draw such guidance from *Capital Gains* for several reasons.   First, wholly apart from its discussion of the judicial treatment of "fraud" at law and in equity, the Court in *Capital Gains* found strong support in the legislative history for its conclusion that the Commission need not demonstrate intent to enjoin practices in violation of § 206 (2).   By contrast, as the Court in *Hochfelder* noted, the legislative history of § 10 (b) points towards a scienter requirement.   Second, it is quite clear that the language in question in *Capital Gains*, "any . . . practice . . . which *operates* as a fraud or deceit," (emphasis added) focuses not on the intent of the investment adviser, but rather on the effect of a particular practice.   Again, by contrast, the Court in *Hochfelder* found that the language of § 10 (b)—particularly the terms "manipulative," "device," and "contrivance"—clearly refers to "knowing or intentional misconduct."   Finally, insofar as *Capital Gains* involved a statutory provision regulating the special fiduciary relationship between an investment adviser and his client, the Court there was dealing with a situation in which intent to defraud would not have been required even in a common-law action for money damages.[12]

---

[11] The Commission finds further support for its interpretation of § 10 (b) as not requiring proof of scienter in injunctive proceedings in the fact that Congress was expressly informed of the Commission's interpretation on two occasions when significant amendments to the securities laws were enacted—the Securities Act Amendments of 1975, Pub. L. 94–29, 89 Stat. 97, and the Foreign Corrupt Practices Act of 1977, Pub. L. 95–213, 91 Stat. 1494—and on each occasion Congress left the administrative interpretation undisturbed.  See S. Rep. No. 94–75, p. 76 (1975); H. R. Rep. No. 95–640, p. 10 (1977).  But, since the legislative consideration of those statutes was addressed principally to matters other than that at issue here, it is our view that the failure of Congress to overturn the Commission's interpretation falls far short of providing a basis to support a construction of § 10 (b) so clearly at odds with its plain meaning and legislative history.  See *SEC* v. *Sloan*, 436 U. S. 103, 119–121.

[12] The Court in *Capital Gains* concluded: "Thus, even if we were to agree with the courts below that Congress had intended, in effect, to

Section 10 (b), unlike the provision at issue in *Capital Gains*, applies with equal force to both fiduciary and nonfiduciary transactions in securities. It is our view, in sum, that the controlling precedent here is not *Capital Gains*, but rather *Hochfelder*. Accordingly, we conclude that scienter is a necessary element of a violation of § 10 (b) and Rule 10b–5.

## B

In determining whether proof of scienter is a necessary element of a violation of § 17 (a), there is less precedential authority in this Court to guide us. But the controlling principles are well settled. Though cognizant that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes,' " *Affiliated Ute Citizens* v. *United States*, 406 U. S., at 151, quoting, *SEC* v. *Capital Gains Research Bureau*, 375 U. S., at 195, the Court has also noted that "generalized references to the 'remedial purposes' " of the securities laws "will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.' " *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 578, quoting, *SEC* v. *Sloan*, 436 U. S. 103, 116. Thus, if the language of a provision of the securities laws is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary "to examine the additional considerations of 'policy' . . . that may have influenced the lawmakers in their formulation of the statute." *Ernst & Ernst* v. *Hochfelder*, 425 U. S., at 214, n. 33.

The language of § 17 (a) strongly suggests that Congress contemplated a scienter requirement under § 17 (a)(1), but

codify the common law of fraud in the Investment Advisers Act of 1940, it would be logical to conclude that Congress codified the common law 'remedially' *as the courts had adapted it to the prevention of fraudulent securities transactions by fiduciaries,* not 'technically' as it has traditionally been applied in damage suits between parties to arm's-length transactions involving land and ordinary chattels." 375 U. S., at 195 (emphasis added).

not under § 17 (a)(2) or § 17 (a)(3). The language of § 17 (a)(1), which makes it unlawful "to employ any device, scheme, or artifice to defraud," plainly evinces an intent on the part of Congress to proscribe only knowing or intentional misconduct. Even if it be assumed that the term "defraud" is ambiguous, given its varied meanings at law and in equity, the terms "device," "scheme," and "artifice" all connote knowing or intentional practices.[13] Indeed, the term "device," which also appears in § 10 (b), figured prominently in the Court's conclusion in *Hochfelder* that the plain meaning of § 10 (b) embraces a scienter requirement.[14]   *Id.*, at 199.

By contrast, the language of § 17 (a)(2), which prohibits any person from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact," is devoid of any suggestion whatsoever of a scienter requirement. As a well-known commentator has noted, "[t]here is nothing on the face of Clause (2) itself which smacks of *scienter* or intent to defraud." 3 L. Loss, Securities Regulation 1442 (2d ed. 1961). In fact, this Court in *Hochfelder* pointed out that the similar language of Rule 10b-5 (b) "could be read as proscribing . . . any type of material misstatement or omission . . . that has the effect of defrauding investors, whether the wrongdoing was intentional or not." 425 U. S., at 212.

Finally, the language of § 17 (a)(3), under which it is

---

[13] Webster's International Dictionary (2d ed. 1934) defines (1) "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," (2) "scheme" as "[a] plan or program of something to be done; an enterprise; a project; as, a business *scheme*[, or a] crafty, unethical project," and (3) "artifice" as a "[c]rafty device; trickery; also, an artful stratagem or trick; artfulness; ingeniousness."

[14] In addition, the Court in *Hochfelder* noted that the term "to employ," which appears in both § 10 (b) and § 17 (a)(1), is "supportive of the view that Congress did not intend § 10 (b) to embrace negligent conduct." 425 U. S., at 199, n. 20.

unlawful for any person "to engage in any transaction, practice, or course of business which *operates* or *would operate* as a fraud or deceit," (emphasis added) quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible. This reading follows directly from *Capital Gains,* which attributed to a similarly worded provision in § 206 (2) of the Investment Advisers Act of 1940 a meaning that does not require a "showing [of] deliberate dishonesty as a condition precedent to protecting investors." 375 U. S., at 200.

It is our view, in sum, that the language of § 17 (a) requires scienter under § 17 (a)(1), but not under § 17 (a)(2) or § 17 (a)(3). Although the parties have urged the Court to adopt a uniform culpability requirement for the three subparagraphs of § 17 (a), the language of the section is simply not amenable to such an interpretation. This is not the first time that this Court has had occasion to emphasize the distinctions among the three subparagraphs of § 17 (a). In *United States* v. *Naftalin,* 441 U. S. 768, 774, the Court noted that each subparagraph of § 17 (a) "proscribes a distinct category of misconduct. Each succeeding prohibition is meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." (Footnote omitted.) Indeed, since Congress drafted § 17 (a) in such a manner as to compel the conclusion that scienter is required under one subparagraph but not under the other two, it would take a very clear expression in the legislative history of congressional intent to the contrary to justify the conclusion that the statute does not mean what it so plainly seems to say.

We find no such expression of congressional intent in the legislative history. The provisions ultimately enacted as § 17 (a) had their genesis in § 13 of identical bills introduced simultaneously in the House and Senate in 1933. H. R. 4314, 73d Cong., 1st Sess. (Mar. 29, 1933); S. 875, 73d Cong., 1st

Sess. (Mar. 29, 1933).[15] As originally drafted, § 13 would have made it unlawful for any person

> "willfully to employ any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise, or to engage in any transaction, practice, or course of business . . . which operates or would operate as a fraud upon the purchaser."

Hearings on these bills were conducted by both the House Interstate and Foreign Commerce Committee and the Senate Banking and Currency Committee.

The House and Senate Committees reported out different versions of § 13. The Senate Committee expanded its ambit by including protection against the intentionally fraudulent practices of a "dummy," a person holding legal or nominal title but under a moral or legal obligation to act for someone else. As amended by the Senate Committee, § 13 made it unlawful for any person

> "willfully to employ any device, scheme, or artifice or to employ any 'dummy', or to act as any such 'dummy', with the intent to defraud or to obtain money or property by means of any false pretense, representation, or promise, or to engage in any transaction, practice, or course of business . . . which operates or would operate as a fraud upon the purchaser. . . ."

See S. 875, 73d Cong., 1st Sess. (Apr. 27, 1933); S. Rep. No. 47, 73d Cong., 1st Sess., 4–5 (1933). The House Committee retained the original version of § 13, except that the word "willfully" was deleted from the beginning of the provision.[16] See H. R. 5480, 73d Cong., 1st Sess., § 16 (a) (May 4,

---

[15] During the House hearings, H. R. 5480 was substituted for H. R. 4314. See H. R. 5480, 73d Cong., 1st Sess. (May 4, 1933).

[16] The House Committee also renumbered § 13 as § 16 (a), divided the provision into three subparagraphs, and modified the language of the

1933). It also rejected a suggestion that the first clause, "to employ any device, scheme, or artifice," be modified by the phrase, "with intent to defraud." See *ibid.*; Federal Securities Act: Hearings on H. R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., 146 (1933). The House and Senate each adopted the version of the provision as reported out by its Committee. The Conference Committee then adopted the House version with a minor modification not relevant here, see H. R. Conf. Rep. No. 152, 73d Cong., 1st Sess., 12, 27 (1933), and it was later enacted into law as § 17 (a) of the 1933 Act.

The Commission argues that the deliberate elimination of the language of intent reveals that Congress considered and rejected a scienter requirement under all three clauses of § 17 (a). This argument, however, rests entirely on inference, for the Conference Report sheds no light on what the Conference Committee meant to do about the question of scienter under § 17 (a).[17] The legislative history thus gives rise to the equally plausible inference that the Conference Committee concluded that (1) in light of the plain meaning of § 17 (a)(1), the language of intent—"willfully" and "with intent to defraud"—was simply redundant, and (2) with regard to § 17 (a)(2) and § 17 (a)(3), a "willful[ness]" requirement was not to be included. It seems clear, therefore, that the

---

second subparagraph in a manner not relevant here. See H. R. 5480, 73d Cong., 1st Sess., § 16 (a) (May 4, 1933).

[17] Although explaining that the "dummy" provision in the Senate bill was deleted from § 13 because it was substituted in modified form elsewhere in the statute, H. R. Conf. Rep. No. 152, 73d Cong., 1st Sess., 27 (1933), the Conference Report contained no explanation of why the Conference Committee acquiesced in the decision of the House to delete the word "willfully" from § 13. That the Committee failed to explain why it followed the House bill in this regard is not in itself significant, since the Conference Report, by its own terms, purported to discuss only the "differences between the House bill and the substitute agreed upon by the conferees." *Id.*, at 24. The deletion of the word "willfully" was common to both the House bill and the Conference substitute.

legislative history, albeit ambiguous, may be read in a manner entirely consistent with the plain meaning of § 17 (a).[18] In the absence of a conflict between reasonably plain meaning and legislative history, the words of the statute must prevail.[19]

## C

There remains to be determined whether the provisions authorizing injunctive relief, § 20 (b) of the 1933 Act and § 21 (d) of the 1934 Act, modify the substantive provisions at issue in this case so far as scienter is concerned.

The language and legislative history of § 20 (b) and § 21 (d) both indicate that Congress intended neither to add to nor to detract from the requisite showing of scienter under the substantive provisions at issue. Sections 20 (b) and 21 (d) provide that the Commission may seek injunctive relief whenever it appears that a person "is engaged or [is] about to engage in any acts or practices" constituting a violation of the 1933 or 1934 Acts or regulations promulgated thereunder and that, "upon a proper showing," a district court shall grant the injunction. The elements of "a proper showing" thus include, at a minimum, proof that a person is engaged in or is about

---

[18] The Commission, in further support of its view that scienter is not required under any of the subparagraphs of § 17 (a), points out that § 17 (a) was patterned upon New York's Martin Act, N. Y. Gen. Bus. Law §§ 352–353 (Consol. 1921), and that the New York Court of Appeals had construed the Martin Act as not requiring a showing of scienter as a predicate for injunctive relief by the New York Attorney General. *People* v. *Federated Radio Corp.*, 244 N. Y. 33, 154 N. E. 655 (1926). But, in the absence of any indication that Congress was even aware of the *Federated Radio* decision, much less that it approved of that decision, it cannot fairly be inferred that Congress intended to adopt not only the language of the Martin Act, but also a state judicial interpretation of that statute at odds with the plain meaning of the language Congress enacted as § 17 (a)(1).

[19] Since the language and legislative history of § 17(a) are dispositive, we have no occasion to address the "policy" arguments advanced by the parties. See *Ernst & Ernst* v. *Hochfelder*, 425 U. S., at 214, n. 33.

to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder. Accordingly, when scienter is an element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue. But with respect to those provisions such as § 17 (a) (2) and § 17 (a) (3), which may be violated even in the absence of scienter, nothing on the face of § 20 (b) or § 21 (d) purports to impose an independent requirement of scienter. And there is nothing in the legislative history of either provision to suggest a contrary legislative intent.

This is not to say, however, that scienter has no bearing at all on whether a district court should enjoin a person violating or about to violate § 17 (a) (2) or § 17 (a) (3). In cases where the Commission is seeking to enjoin a person *"about* to engage in any acts or practices which . . . *will* constitute" a violation of those provisions, the Commission must establish a sufficient evidentiary predicate to show that such future violation may occur. See *SEC* v. *Commonwealth Chemical Securities, Inc.,* 574 F. 2d 90, 98–100 (CA2 1978) (Friendly, J.); 3 L. Loss, Securities Regulation, at 1976. An important factor in this regard is the degree of intentional wrongdoing evident in a defendant's past conduct. See *SEC* v. *Wills,* 472 F. Supp. 1250, 1273–1275 (DC 1978). Moreover, as the Commission recognizes, a district court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief. And the proper exercise of equitable discretion is necessary to ensure a "nice adjustment and reconciliation between the public interest and private needs." *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329.

## III

For the reasons stated in this opinion, we hold that the Commission is required to establish scienter as an element of a civil enforcement action to enjoin violations of § 17 (a) (1) of the 1933 Act, § 10 (b) of the 1934 Act, and Rule 10b–5

promulgated under that section of the 1934 Act. We further hold that the Commission need not establish scienter as an element of an action to enjoin violations of § 17 (a)(2) and § 17 (a)(3) of the 1933 Act. The Court of Appeals affirmed the issuance of the injunction in this case in the misapprehension that it was not necessary to find scienter in order to support an injunction under any of the provisions in question. Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Chief Justice Burger, concurring.

I join the opinion of the Court and write separately to make three points:

(1) No matter what mental state § 10 (b) and § 17 (a) were to require, it is clear that the District Court was correct here in entering an injunction against petitioner. Petitioner was informed by an attorney representing Lawn-A-Mat that two representatives of petitioner's firm were making grossly fraudulent statements to promote Lawn-A-Mat stock. Yet he took no steps to prevent such conduct from recurring. He neither discharged the salesmen nor rebuked them; he did nothing whatever to indicate that such salesmanship was unethical, illegal, and should stop. Hence, the District Court's findings (a) that petitioner "intentionally failed" to terminate the fraud and (b) that his conduct was reasonably likely to repeat itself find abundant support in the record. In my view, the Court of Appeals could well have affirmed on that ground alone.

(2) I agree that § 10 (b) and § 17 (a)(1) require scienter but that § 17 (a)(2) and § 17 (a)(3) do not. I recognize, of course, that this holding "drives a wedge between [sellers and buyers] and says that henceforth only the seller's negligent misrepresentations may be enjoined." *Post,* at 715 (BLACK-MUN, J., dissenting). But it is not this Court that "drives a

wedge"; Congress has done that. The Court's holding is compelled in large measure by *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185 (1976), and gives effect to congressional intent as manifested in the language of the statutes and in their histories. If, as intimated, the result is "bad" public policy, that is the concern of Congress where changes can be made.

(3) It bears mention that this dispute, though pressed vigorously by both sides, may be much ado about nothing. This is so because of the requirement in injunctive proceedings of a showing that "there is a reasonable likelihood that the wrong will be repeated." *SEC* v. *Manor Nursing Centers, Inc.,* 458 F. 2d 1082, 1100 (CA2 1975). Accord, *SEC* v. *Keller Corp.,* 323 F. 2d 397, 402 (CA7 1963). To make such a showing, it will almost always be necessary for the Commission to demonstrate that the defendant's past sins have been the result of more than negligence. Because the Commission must show some likelihood of a future violation, defendants whose past actions have been in good faith are not likely to be enjoined. See opinion of the Court, *ante,* at 701. That is as it should be. An injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

I concur in the Court's judgment that §§ 17 (a)(2) and (3) of the Securities Act of 1933, 15 U. S. C. §§ 77q (a)(2) and (3), do not require a showing of scienter for purposes of an action for injunctive relief brought by the Securities and Exchange Commission. I dissent from the remainder of the Court's reasoning and judgment. I am of the view that neither § 17 (a)(1) of the 1933 Act, 15 U. S. C. § 77q (a)(1), nor § 10 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j (b), as elaborated by SEC Rule 10b–5, 17 CFR § 240.10b–5 (1979), requires the Commission to prove scienter

before it can obtain equitable protection against deceptive practices in securities trading. Accordingly, I would affirm the judgment of the Court of Appeals in its entirety.

The issues before the Court in this case are important and critical. Sections 17 (a) and 10 (b) are the primary anti-fraud provisions of the federal securities laws. They are the chief means through which the Commission, by exercise of its authority to bring actions for injunctive relief, can seek protection against deception in the marketplace. See § 20 (b) of the 1933 Act, 15 U. S. C. § 77t (b); § 21 (d) of the 1934 Act, 15 U. S. C. § 78u (d). As a result, they are key weapons in the statutory arsenal for securing market integrity and investor confidence. See Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L. J. 171, 182 (1933); Note, 57 Yale L. J. 1023 (1948). If the Commission is denied the ability effectively to nip in the bud the misrepresentations and deceptions that its investigations have revealed, honest investors will be the ones who suffer. Often they may find themselves stripped of their investments through reliance on information that the Commission knew was misleading but lacked the power to stop or contain.

Today's decision requires the Commission to prove scienter in many, if not most, situations before it is able to obtain an injunction. This holding unnecessarily undercuts the Commission's authority to police the marketplace. As I read the Court's opinion, it is little more than an extrapolation of the reasoning that was employed in *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185 (1976), in imposing a scienter requirement upon private actions for damages implied under § 10 (b) and Rule 10b–5. Whatever the authority of *Hochfelder* may be in its own context, I perceive little reason to regard it as governing precedent here. I believe that there are sound reasons for distinguishing between private damages actions and public enforcement actions under these statutes, and for applying a scienter standard, if one must be applied anywhere, only in the former class of cases.

## I

In keeping with the reasoning of *Hochfelder,* the Court places much emphasis upon statutory language and its assertedly plain meaning. The words "device, scheme, or artifice to defraud" in § 17 (a)(1), and the words "manipulative or deceptive device or contrivance" in § 10 (b), are said to connote "knowing or intentional misconduct." *Ante,* at 690, 696. And this connotation, it is said, implicitly incorporates the requirement of scienter traditionally applicable in the common law of fraud. But there are at least two specific responses to this wooden analysis. First, it is quite unclear that the words themselves call for so restrictive a definition. Second, as the Court recognized in *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180 (1963), the common-law requirement of scienter generally observed in actions for fraud at law was often dispensed with in actions brought before chancery.

## A

The words of a statute, particularly one with a remedial object, have a " 'meaning imparted to them by the mischief to be remedied.' " *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531, 545 (1978), quoting *Duparquet Co.* v. *Evans,* 297 U. S. 216, 221 (1936). Thus, antifraud provisions of securities legislation are to be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." *SEC* v. *Capital Gains Research Bureau,* 375 U. S., at 195; *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 12 (1971); *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972). See also *SEC* v. *C. M. Joiner Leasing Corp.,* 320 U. S. 344, 350–351 (1943); *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 849–851 (1975). I have no doubt that the "mischief" confronting Congress in 1933 and 1934 included a large measure of intentional deceit and misrepresentation. The concern, however, ran deeper still, and Congress sought to develop a regulatory

framework that would ensure a free flow of honest, reliable information in the securities markets. This Court has recognized that it was Congress' desire "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*," and to place upon those in control of information the responsibility for misrepresentation. *SEC* v. *Capital Gains Research Bureau*, 375 U. S., at 186; see, *e. g.*, H. R. Rep. No. 85, 73d Cong., 1st Sess., 1–5 (1933); Securities Act: Hearings on S. 875 before the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 71 (1933). This step was perceived as a fundamental prerequisite to restoration of investor confidence sorely needed after the market debacles that helped to plummet the Nation into a major economic depression. See *United States* v. *Naftalin*, 441 U. S. 768, 775 (1979).

Reading the language of § 17 (a)(1) and § 10 (b) with these purposes in mind, I am not at all certain—although the Court professes to be—that the language is incapable of being read to include misrepresentations that result from something less than willful behavior. The word "willfully," that Congress employed elsewhere in the securities laws when it wanted to specify a prerequisite of knowledge or intent, is conspicuously missing.[1] Instead, Congress employed a variety of

---

[1] The word "willfully" was originally included in the draft of what was to become § 17 (a) of the 1933 Act, and both Houses of Congress considered the addition of the phrase "with intent to defraud" to the language of that provision. That phrase ultimately was inserted by the Senate, but the bill that emerged from conference lacked either of the references to a state-of-mind requirement. See H. R. 4314, § 13, 73d Cong., 1st Sess. (Mar. 29, 1933); S. 875, § 13, 73d Cong., 1st Sess. (Apr. 27, 1933); H. R. Conf. Rep. No. 152, 73d Cong., 1st Sess., 12, 26–27 (1933). The House bill, which as reported did not contain the words "willfully" and "intent to defraud," see H. R. 5480, § 16 (a), 73d Cong., 1st Sess. (May 4, 1933), was used by the conferees as their working draft. See Landis, The Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev. 29, 45 (1959).

The Court suggests that no meaning should be attributed to these events, because Congress never explained its reasons for deleting this

terms to describe the conduct that it authorized the Commission to prohibit. These operative terms are expressed in the disjunctive, and each should be given its separate meaning. Contrary to the Court's view, I would conclude that they identify a range of behavior, including but not limited to intentional misconduct, and that they admit an interpretation, in the context of Commission enforcement actions, that reaches deceptive practices whether the common-law condition of scienter is specifically present or not.

For example, the word "device" that is common to both statutes may have a far broader scope than the Court suggests. The legislative history of the 1934 Act used that term as a synonym for "practice," a word without any strong connotation of scienter, and it expressed a desire to confer upon the Commission authority under § 10 (b) to prohibit "any ... manipulative or deceptive practices . . . detrimental to the interests of the investor." S Rep. No. 792, 73d Cong., 2d Sess., 18 (1934). The term "device" also was used in § 15

---

explicit state-of-mind language. *Ante,* at 699–700. But the Conference Report, which discussed differences between the House bill and the Conference substitute, noted that the conferees had adopted from the Senate bill several "minor and clarifying changes" that were intended "to make clear and effective the administrative procedure provided for and to remove uncertainties" concerning the powers of the Commission. H. R. Conf. Rep. No. 152, 73d Cong., 1st Sess., 24 (1933). If the Court were correct in its interpretation of § 17 (a)(1), retention of the Senate's explicit state-of-mind language undoubtedly would have added clarity to congressional intent. In light of the other changes to which the House acceded, it is thus difficult, on the Court's theory, to understand why this change would not have been adopted as well. Moreover, Congress was well aware of the significance that addition or deletion of these terms would have. See 77 Cong. Rec. 2994 (1933) (colloquy between Sens. Fess and Fletcher); *id.,* at 2919 (remarks of Rep. Rayburn). It is also noteworthy that, when the 1934 Act was under consideration, a proposal was placed before Congress to amend § 17 (a) to limit it to conduct that was undertaken "willfully and with intent to deceive." 78 Cong. Rec. 8703 (1934). The proposal was voted down. *Id.,* at 8708.

(c)(1) of the Securities Exchange Act, 15 U. S. C. § 78*o* (c)(1), where it has been interpreted with congressional approval to apply to negligent acts and practices. See SEC Rule 15c–1–2, 17 CFR § 240.15c1–2 (1979); H. R. Rep. No. 2307, 75th Cong., 3d Sess., 10 (1938). Moreover, "device" had been given broad definition in prior enactments. In *Armour Packing Co.* v. *United States,* 209 U. S. 56, 71 (1908), the Court rejected the contention that its meaning in the Elkins Act, 32 Stat. 847, should be limited to conduct involving resort to underhanded, dishonest, or fraudulent means.

In my view, this evidence provides a stronger indication of congressional understanding of the term "device" than the dictionary definition on which the Court relies. *Ante,* at 696, n. 13; cf. *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 199, n. 20.[2] At the very least, it fully counters the Court's bald assertion that the meaning of terms used in the antifraud provisions is sufficiently "plain" that statutory policy and administrative interpretation may be ignored in defining the scope of the legislation. See *ante,* at 695, 700, n. 19. Division in the lower courts over the issues before us is itself an indication that reasonable minds differ over the import of the terminology that Congress has used. I can agree with the Court that the language of the statutes is the starting point of analysis, but at least in present circumstances I strongly disagree with the conclusion that it is the ending point as well.

---

[2] I perceive no reason why the misrepresentations concerning Lawn-A-Mat Chemical & Equipment Corp. spread by petitioner's brokerage house would not qualify as a "device . . . to defraud," within the meaning of § 17 (a)(1), or as a "deceptive device" in contravention of Rule 10b–5, within the meaning of § 10 (b). I do not regard the word "deceptive," which focuses more on effect than on purpose, as adding significant connotations of scienter to the word "device." In light of the Court's disposition of this case, I shall not consider whether the misrepresentations might be reached under § 17 (a)(2) or § 17 (a)(3) as well, or whether the facts of the case establish scienter, as the District Court found.

## B

An additional and independent ground for disagreement with the Court's analysis is its utter failure to harmonize statutory construction with prevailing equity practice at the time the securities laws were enacted. On prior occasions, the Court has emphasized the relevance of common-law principles in the interpretation of the antifraud provisions of the securities laws. See, *e. g., Chiarella* v. *United States,* 445 U. S. 222, 227–229 (1980). See also *Lanza* v. *Drexel & Co.,* 479 F. 2d 1277, 1289–1291 (CA2 1973) (en banc). Yet in this case, the Court oddly finds those principles inapplicable. It specifically casts aside the fact that proof of scienter was not required in actions seeking equitable relief against fraudulent practices. This position stands in stark contrast with the Court's clear recognition of this separate equity tradition in *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180 (1963).

In *Capital Gains,* the Court was called upon to construe § 206 (2) of the Investment Advisers Act of 1940, 54 Stat. 847, as amended, 15 U. S. C. § 80b–6 (2). The statute is a general antifraud provision framed in language similar to that of § 17 (a)(3) of the 1933 Act. The Court of Appeals, sitting en banc, had decided by a close vote that the Commission could not obtain an injunction for violation of the statute unless it proved scienter. See *SEC* v. *Capital Gains Research Bureau,* 306 F. 2d 606 (CA2 1962). This Court, rejecting the view of the lower court that scienter was required in all cases involving fraud, reversed. It said:

> "The content of common-law fraud has not remained static as the courts below seem to have assumed. It has varied, for example, with the nature of the relief sought, the relationship between the parties, and the merchandise in issue. It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages." 375 U. S., at 193.

In particular, the Court observed that proof of scienter was one element of an action for damages that the equity courts omitted. *Id.,* at 193–194. See also *Moore* v. *Crawford,* 130 U. S. 122, 128 (1889).

The Court does not now dispute the veracity of what it said in *Capital Gains.* Indeed, the different standards for fraud in law and at equity have been noted by commentators for more than a century. See, *e. g.,* 1 J. Story, Equity Jurisprudence §§ 186–187 (6th ed. 1853); G. Bower, The Law of Actionable Misrepresentation § 250 (1911); 2 J. Pomeroy, Equity Jurisprudence § 885 (4th ed. 1918); 3 S. Williston, The Law of Contracts § 1500 (1920); W. Walsh, Equity § 109, p. 509 (1930). See also Shulman, Civil Liability and the Securities Act, 43 Yale L. J. 227, 231 (1933). The difference originally may have been attributable more to historical accident than to any conscious policy. See Keeton, Actionable Misrepresentation: Legal Fault as a Requirement (Part I), 1 Okla. L. Rev. 21, 23 (1948). But as one commentator explained, it has survived because in equity "[i]t is not the *cause* but the *fact,* of injury, and the problem of its practical control through judicial action, which concern the court." 1 F. Lawrence, Substantive Law of Equity Jurisprudence § 13 (1929) (emphasis in original); see also *id.,* § 17. As a consequence of this different focus, common-law courts consistently have held that in an action for rescission or other equitable relief the fact of material misrepresentation is sufficient, and the knowledge or purpose of the wrongdoer need not be shown.

The Court purports to distinguish *Capital Gains* on the grounds that it involved a different statutory provision with somewhat different language, and that it stressed the confidential duties of investment advisers to their clients. *Ante,* at 693–695. These observations, in my view, do not weaken the relevance of the history on which the Court in *Capital Gains* relied. In fact, that history may be even more pertinent here. This case involves actual *dissemination* of material

false statements by a broker-dealer serving as market maker in the relevant security; *Capital Gains* involved an investment adviser's *omission* to state material facts. Because there was no affirmative misrepresentation in *Capital Gains,* the existence of a confidential duty arguably was necessary before the broker's silence could become the basis for a charge of fraud. Cf. *Chiarella* v. *United States,* 445 U. S., at 228. Here, in contrast, the fraudulent nature of the underlying conduct is clear, and the only issue is whether the Commission may obtain the desired prophylactic relief.

The significance of this common-law tradition, moreover, is buttressed by reference to state precursors of the federal securities laws. The problem of securities fraud was by no means new in 1933, and many States had attempted to deal with it by enactment of their own "blue-sky" statutes. When Congress turned to the problem, it explicitly drew from their experience. One variety of state statute, the so-called "fraud" laws of New York, New Jersey, Maryland, and Delaware, empowered the respective state attorneys general to bring actions for injunctive relief when fraudulent practices in the sale of securities were uncovered. See, *e. g.,* Federal Securities Act, Hearings on H. R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., 95 (1933). Of these statutes, the most prominent was the Martin Act of New York, 1921 N. Y. Laws, ch. 649, N. Y. Gen. Bus. Law §§ 352–353 (Consol. 1921), which had been fairly actively enforced. The drafters of the federal securities laws referred to these specific statutes as models for the power to seek injunctive relief that they requested for federal enforcement authorities. The experience of the State of New York, in particular, was repeatedly called to Congress' attention as an example for federal legislation to follow.[3]

---

[3] See, *e. g.,* Federal Securities Act, Hearings on H. R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., 11, 95, 109, 112 (1933); Securities Act: Hearings on S. 875 before the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 71,

In light of this legislative history, I find it far more significant than does the Court that proof of scienter was not a prerequisite to relief under the Martin Act and other similar "blue-sky" laws. In *People* v. *Federated Radio Corp.*, 244 N. Y. 33, 154 N. E. 655 (1926), the New York Court of Appeals held that lack of scienter was no defense to Martin Act liability. The court justified this decision by looking to the traditional equity practice to which I have referred. It held:

> "[I]ntentional misstatements, as in an action at law to recover damages for fraud and deceit . . . need not be alleged. Material misrepresentations intended to influence the bargain, on which an action might be maintained in equity to rescind a consummated transaction, are enough." *Id.*, at 40–41, 154 N. E., at 658.

This decision was in keeping with the general tenor of state laws governing equitable relief in the context of securities transactions. See Note, 40 Yale L. J. 987, 988 (1931).

The Court dismisses all this evidence with the observation, *ante,* at 700, n. 18, that the specific holdings of cases like *Federated Radio* were not explicitly placed before Congress. Yet these were not isolated holdings or novel twists of law. They were part of an established, longstanding equity tradition the significance of which the Court has chosen simply to ignore. I am convinced that Congress was aware of this tradition, see n. 3, *supra,* and that if it had intended to depart from it, it would have left more traces of that intention than the Court has been able to find. Cf. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944) ("We are dealing here with the requirements of equity practice with a background of several hundred years of history").

---

146–147, 156, 170, 245–246, 253 (1933); see also 78 Cong. Rec. 8096 (1934). For a general discussion of state precursors and their consideration by Congress, see 1 L. Loss, Securities Regulation 33–34, 35–43 (2d ed. 1961).

## II

Although I disagree with the Court's textual exegesis and its assessment of history, I believe its most serious error may be a failure to appreciate the structural interrelationship among equitable remedies in the 1933 and 1934 Acts, and to accord that interrelationship proper weight in determining the substantive reach of the Commission's enforcement powers under § 17 (a) and § 10 (b).

The structural considerations that were advanced in support of the decision to require proof of scienter in a private action for damages, see *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 206–211, have no application in the present context. In *Hochfelder,* the Court noted that Congress had placed significant limitations on the private causes of action for negligence that were available under provisions of the 1934 Act other than § 10 (b). *Ibid.* It concluded that the effectiveness of these companion statutes might be undermined if private plaintiffs sustaining losses from negligent behavior also could sue for damages under § 10 (b). *Id.,* at 210. Obviously, no such danger is created by Commission-initiated actions for injunctive relief, and the Court admits as much. *Ante,* at 691, n. 9.[4]

In fact, the consistent pattern in both the 1933 Act and the 1934 Act is to grant the Commission broad authority to seek enforcement without regard to scienter, unless criminal punishments are contemplated. In both Acts, state of mind is treated with some precision. Congress used terms such as

---

[4] Nor is there any danger that actions for prophylactic relief brought by the Commission will result in the " 'broadening of the class of plaintiff who may sue in this area of the law,' " that has been an animating concern of the Court's decisions limiting the scope of private damages actions under § 10 (b). *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 214, n. 33 (1976), quoting *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 747–748 (1975). Compare *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 179–180, 174 N. E. 441, 444 (1931), with *People* v. *Federated Radio Corp.,* 244 N. Y. 33, 154 N. E 655 (1926).

"knowing," "willful," and "good faith," when it wished to impose a state-of-mind requirement. The omission of such terms in statutory provisions authorizing the Commission to sue for injunctive relief contrasts sharply with their inclusion in provisions authorizing criminal prosecution. Compare § 20 (b) of the 1933 Act, 15 U. S. C. § 77t (b), and § 21 (d) of the 1934 Act, 15 U. S. C. § 78u (d), with § 24 of the 1933 Act, 15 U. S. C. § 77x, and § 32 (a) of the 1934 Act, 15 U. S. C. § 78ff (a). Moreover, the Acts create other civil remedies that may be pursued by the Commission that do not include state-of-mind prerequisites.[5] This pattern comports with Congress' expressed intent to give the Commission maximum flexibility to deal with new or unanticipated problems, rather than to confine its enforcement efforts within a rigid statutory framework. See, e. g., H. R. Rep. No. 1383, 73d Cong., 2d Sess., 6–7 (1934); S. Rep. No. 792, 73d Cong., 2d Sess., 5–6 (1934); 78 Cong. Rec. 8113 (1934).

The Court's decision deviates from this statutory scheme. That deviation, of course, is only partial. After today's decision, it still will be possible for the Commission to obtain relief against some negligent misrepresentations under § 17 (a) of the 1933 Act. Yet this halfway-house approach itself highlights the error of the Court's decision. Rule 10b–5 was promulgated to fill a gap in federal securities legislation, and

[5] The prohibition in § 5 of the 1933 Act, 15 U. S. C. § 77e, against selling securities without an effective registration statement has been interpreted to require no showing of scienter. See, e. g., SEC v. Spectrum, Ltd., 489 F. 2d 535, 541–542 (CA2 1973); SEC v. North American Research & Development Corp., 424 F. 2d 63, 73–74 (CA2 1970). See also § 8 (b), 15 U. S. C. § 77h (b) (power to withhold registration effectiveness); § 8 (d), 15 U. S. C. § 77h (d) (power to issue "stop order" suspending registration effectiveness). The 1934 Act incorporated the culpability requirements for Commission remedies that the 1933 Act had established, although it did set a scienter standard for SEC remedies of criminal prosecution and administrative revocation of broker-dealer registrations. See Securities Exchange Act of 1934, Tit. II, § 210, 48 Stat. 908–909.

to apply to both purchasers and sellers under § 10 (b) the legal duties that § 17 (a) had applied to sellers alone. See *Ward La France Truck Corp.,* 13 S. E. C. 373, 381, n. 8 (1943); SEC Release No. 3230 (May 21, 1942). As the Commission thus recognized, the two statutes should operate in harmony. The Court now drives a wedge between them, and says that henceforth only the seller's negligent misrepresentations may be enjoined. I have searched in vain for any reason in policy or logic to support this division. Its only support, so far as I can tell, is to be found in the Court's technical linguistic analysis.

Many lower courts have refused to go so far. Both before and after *Hochfelder,* they have rejected the contention that the Commission must prove scienter under either § 17 (a) or § 10 (b) before it can obtain injunctive relief against deceptive practices.[6] Even those judges who anticipated *Hochfelder* by advocating a scienter requirement in private actions for money damages found no reason to place similar strictures on the Commission. See, *e. g., SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833, 866–868 (CA2 1968) (concurring opinion), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969), cited with approval in *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 197, 211, 213, 214.

---

[6] For cases involving § 10 (b) see, *e. g., SEC* v. *World Radio Mission,* 544 F. 2d 535, 541, n. 10 (CA1 1976); *SEC* v. *Management Dynamics, Inc.,* 515 F. 2d 801, 809 (CA2 1975); *SEC* v. *Manor Nursing Centers, Inc.,* 458 F. 2d 1082, 1096 (CA2 1972); *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833, 863 (CA2 1968), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969); *SEC* v. *Dolnick,* 501 F. 2d 1279, 1284 (CA7 1974); *SEC* v. *Geyser Minerals Corp.,* 452 F. 2d 876, 880–881 (CA10 1971). For cases involving § 17 (a) see, *e. g., SEC* v. *World Radio Mission, supra; SEC* v. *Coven,* 581 F. 2d 1020, 1026 (CA2 1978), cert. denied, 440 U. S. 950 (1979); *SEC* v. *American Realty Trust,* 586 F. 2d 1001, 1006–1007 (CA4 1978); *SEC* v. *Van Horn,* 371 F. 2d 181, 185–186 (CA7 1966); *SEC* v. *Geyser Minerals Corp., supra.* Because several of the latter cases turn on interpretations of § 17 (a)(2) or § 17 (a)(3), they do not necessarily conflict in result with today's decision.

The reasons for this refusal to limit the Commission's authority are not difficult to fathom. As one court observed in the context of § 17 (a), "[i]mpressive policies" support the need for Commission authority to seek prophylactic relief against misrepresentations that are caused by negligence, as well as those that are caused by deliberate swindling. *SEC* v. *Coven*, 581 F. 2d 1020, 1027 (CA2 1978), cert. denied, 440 U. S. 950 (1979). False and misleading statements about securities "can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar." *United States* v. *Benjamin*, 328 F. 2d 854, 863 (CA2), cert. denied *sub nom. Howard* v. *United States*, 377 U. S. 953 (1964). And when misinformation causes loss, it is small comfort to the investor to know that he has been bilked by negligent mistake rather than by fraudulent design, particularly when recovery of his loss has been foreclosed by this Court's decisions.[7] As the reported cases illustrate, injunctions against negligent dissemination of misinformation play an essential role in preserving market integrity and preventing serious financial loss.

---

[7] When questioned about civil liability, the drafters of the 1933 Act strongly defended the theory that it would be preferable to place liability for negligent misstatements on the shoulders of those responsible for their dissemination rather than to require innocent investors to suffer in silence. Judge Alexander Holtzoff, then Special Assistant to the Attorney General of the United States, put it this way:

"Criminal liability is based only on knowingly making a false statement. But civil liability exists even in the case of an innocent mistake. Let us assume that an innocent mistake is made and an investor loses money because of it. Now, who should suffer? The man who loses the money or the man who puts the mistake in circulation knowing that other people will rely upon that mistaken statement?" Securities Act, Hearings on S. 875 before the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 207 (1933).

See also Federal Securities Act, Hearings on H. R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., 124–125 (1933) (testimony of Ollie M. Butler, Foreign Service Division, Department of Commerce).

See, *e. g., SEC* v. *World Radio Mission, Inc.,* 544 F. 2d 535, 540–541 (CA1 1976); *SEC* v. *Management Dynamics, Inc.,* 515 F. 2d 801, 809 (CA2 1975); *SEC* v. *Manor Nursing Centers, Inc.,* 458 F. 2d 1082, 1095–1097 (CA2 1972).[8]

### III

I thus arrive at the conclusion that statutory language does not compel the judgment reached by the Court, while considerations of history, statutory structure, legislative purpose, and policy all strongly favor an interpretation of § 17 (a) and § 10 (b) that permits the Commission to seek injunctive relief without first having to prove scienter. In my view, this conclusion is fortified by the fact that Congress has approved it in a related context.[9] Because I find nothing

---

[8] In recognition of the importance to the investing public of the Commission's authority to prevent negligent misstatements, the proposed Federal Securities Code drafted by the American Law Institute provides the Commission with power to obtain injunctions preventing deception and misrepresentation without proof of scienter. ALI, Federal Securities Code §§ 262 (d), 297 (a), 1602 (a), 1819 (a)(3), 1819 (a)(4) (Prop. Off. Draft 1978). The ALI Code has been approved by the American Bar Association, 65 A. B. A. J. 341 (1979).

[9] In 1975, Congress undertook relatively substantial revision of the securities laws. Securities Acts Amendments of 1975, Pub. L. 94–29, 89 Stat. 97; see Securities Acts Amendments of 1975: Hearings on S. 249 before the Subcommittee on Securities of the Senate Committee on Banking, Housing, and Urban Affairs, 94th Cong., 1st Sess., 1 (1975). In the course of its deliberations, Congress had occasion to consider the scope of Commission injunctive remedies. In reliance on the different purposes of Commission enforcement proceedings and private actions, Congress enacted § 21 (g) of the Act, 15 U. S. C. § 78u (g), which provides that, absent consent from the Commission, private actions may not be consolidated with Commission proceedings. The Senate Committee in charge of the legislation observed that Commission enforcement actions and private suits for damages, though both civil in nature, "are very different," and it explained that private suits involve complications that are not present when the Commission seeks injunctive relief:

"Private actions frequently will involve more parties and more issues than the Commission's enforcement action, thus greatly increasing the

whatever in either *Ernst & Ernst* v. *Hochfelder* or today's decision that compels a different result, I dissent.

---

need for extensive pretrial discovery. In particular, issues related to . . . scienter, causation, and the extent of damages, are elements *not* required to be demonstrated in a Commission injunctive action." S. Rep. No. 94–75, p. 76 (1975) (emphasis in original).

In 1977, following the decision in *Ernst & Ernst* v. *Hochfelder*, Congress re-examined the Commission's enforcement authority, this time in connection with the Foreign Corrupt Practices Act of 1977, Pub. L. 95–213, 91 Stat. 1494. Case law was discussed in some detail, and express approval was given to judicial decisions holding that scienter was not required when the SEC sought injunctive relief under Rule 10b–5. The responsible Committee in the House of Representatives declared:

"In the context of an SEC action to enjoin future violations of the securities laws, a defendant's state of mind should make no difference. The harm to the public is the same regardless of whether or not the violative conduct involved scienter. Because an SEC enforcement action is designed to protect the public against the recurrence of violative conduct, and not to punish a state of mind, this Committee intends that scienter is not an element of any Commission enforcement proceeding." H. R. Rep. No. 95–640, p. 10 (1977).

As expressions of later Congresses, these statements, of course, do not control the meaning of provisions enacted in 1933 and 1934. Yet the views of a subsequent Congress are entitled to some weight, particularly when that Congress undertakes significant revision of the statute but leaves the disputed provision intact. Cf., *e. g., Andrus* v. *Allard,* 444 U. S. 51, 59, n. 10 (1979); *United States* v. *Rutherford,* 442 U. S. 544, 553–554 (1979); *Board of Governors* v. *First Lincolnwood Corp.,* 439 U. S. 234, 248 (1978); *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 274–275 (1974).