SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Wayne F. GORSEK, Defendant.

No. 99–3072.

United States District Court, C.D. Illinois, Springfield Division.

May 28, 2002.

Robert B. Kaplan, John P. Winsbro, Mark Kreitman, Bridget Moore, Securities & Exchange Commission, Washington, DC, for Plaintiff.

Phillip W. Offill, Krage & Janvey, LLP, Dallas, TX, Wm. F. Trapp, Brown Hay & Stephens, Springfield, IL, for Defendants Wayne F. Gorsek.

Daniel P. Schuering, John E. Kerley, St. Schuering & Kerley, Springfield, IL, for Defendants Lyndell Parks.

Hugh J. Graham, April Troemper, Graham & Graham, Springfield, IL, for Defendants P. Brenden Gebben.

### ORDER

SCOTT, District Judge.

This matter came before the Court on April 15, 2002, for a bench trial to determine liability of Defendant Wayne F. Gorsek under Counts III and IV of the Complaint. The SEC appeared by its attorneys Robert Kaplan, Mark Kreitman, and Bridget Moore. Gorsek appeared by his attorney Phillip Offill. Counts III and IV allege that Gorsek violated § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b 5 promulgated thereunder, 17 C.F.R. § 240.10b 5; and § 17(a) of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77q(a), in connection with the offer or sale of securities through the brokerage firm Strategic Investments, Inc.(SI). Jurisdiction of the Court is invoked under §§ 22(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) & 77v(a); and §§ 21(d)(3), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), 78u(e) and 78aa. The jurisdiction of the Court is not disputed. For the reasons set forth below, the Court finds that Gorsek violated § 10(b), Rule 10b 5, and § 17(a). The following constitutes findings of fact and conclusions of law. Fed. R.Civ.P. 52.

### I. APPLICABLE LEGAL PRINCIPLES

Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or any facility of a national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, ... any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state any material fact necessary in order to make a statement made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act practice or course of business which operates or would operate as a fraud or deceit upon any person, [all three] in connection with the purchase or sale of any security.

Section 17(a) states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

To establish liability under § 10(b) and Rule 10b–5, the SEC must prove: (1) that

Gorsek made a material misrepresentation or omission by the use of the mails or other instrument of interstate commerce; (2) that Gorsek made a statement or omission with scienter; and (3) that the conduct occurred in connection with the purchase or sale of a security. *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450 (2nd Cir.1996). The elements of a § 17(a) violation are essentially the same as § 10(b) and Rule 10b–5 except the illegal conduct must be made in connection with the offer to sell or sale of securities (not the purchase or offer to purchase), and scienter is not required for §§ 17(a)(2) & (a)(3). *Aaron v. SEC,* 446 U.S. 680, 696, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

## II. *UNDISPUTED FACTS*

The following matters were not in dispute at trial. The matters had either been admitted by the parties or have been determined by the Court in its Order entered April 23, 2001 (d/e 149).

1. From 1993 to 1996, Defendants Gorsek and co-defendant Lyndell Parks owned and operated two businesses in Springfield, Illinois: Strategic Investments, Inc. (SI); and Strategic Advisory, Inc.(a/k/a Strategic Investments Advisory, Inc.)(SA).[1]

2. SA contracted with corporations (Issuers) to prepare and distribute promotional materials, principally materials called *Profiles* and *Updates* (collectively referred to as Promotional Materials), designed to encourage individual investors to purchase stock issued by the Issuers.

3. SA also promoted Issuer stock through telephone calls, internet postings, and various broadcast and print media (Promotional Activities).

---

**1.** As set forth below, witness Terry Pancake states that he also owned stock in SI.

4. Issuers paid SA in stock (including warrants or options to purchase stock) and cash for these services.

5. Some Issuers agreed to pay additional stock or other consideration to SA if the market price of such Issuer's stock rose to a predetermined target price.

6. The Promotional Materials and Promotional Activities contained the following material misrepresentations and omissions of fact:

   a. The Promotional Materials and Promotional Activities falsely represented that SA was a research firm that performed independent analyses of the Issuers, and, based on such analyses, made recommendations to buy Issuers' stock and rendered opinions that Issuers' stock should increase in value. In fact, SA did no independent research or analysis of Issuers, but merely edited information provided by the Issuers and made recommendations and rendered opinions at the direction or with the approval of the Issuers; and

   b. The Promotional Materials and Promotional Activities did not disclose the amount or type of compensation received by SA from Issuers.

7. Gorsek knew that the Promotional Materials and Promotional Activities contained the material misrepresentations and omissions identified in paragraph 6 and recklessly distributed these materially false and deceptive misrepresentations and omissions through SA.

8. SI was a licensed broker-dealer that sold securities to the public.

9. Gorsek (or persons working at his direction) provided SA's Promotional Materials to SI brokerage customers.

10. Gorsek recommended purchasing Issuer stock to SI brokerage customers.

### III. ISSUES AT TRIAL

The issues at trial were:

1. Whether Gorsek (or persons working at his direction) used a means of interstate transportation or communication, or the mail, in connection with the offer or sale of Issuers' stock to SI brokerage customers to whom Gorsek (or persons working at his direction) distributed SA Promotional Materials or communicated the content of SA Promotional Activities.

2. Whether Gorsek (or persons working at his direction) disclosed to SI brokerage customers who received SA Promotional Materials, or heard or saw SA Promotional Activities, that such Promotional Materials and Promotional Activities contained the material misrepresentations and omissions of fact.

3. If additional disclosures were made to SI brokerage customers, whether those disclosures rendered the SA Promotional Materials and Promotional Activities no longer materially false or deceptive as to SI brokerage customers.

4. If additional disclosures were made to SI brokerage customers, whether Gorsek acted recklessly in distributing to SI brokerage customers the combination of the SA Promotional Materials and the additional disclosures.

5. Whether Gorsek (or persons working at his direction) made other material misrepresentations or omissions of fact in connection with the offer or sale of securities to SI customers.

6. Whether Gorsek recklessly or knowingly made, or caused to be made, such other material misrepresentations or omissions of fact in connection with the offer or sale of securities to SI brokerage customers.

## IV. *EVIDENCE*

### A. *SEC's Evidence*

At trial, the SEC presented testimony of two former employees and five former SI brokerage clients. The SEC also submitted account records for each of the client witnesses showing the specific purchases and sales of Issuer stock. The SEC also moved to introduce additional exhibits identified as Exhibits numbered 13, 14, 15, 16, 18, 20, 21, 23, and 24 as part of their case in chief. Gorsek objected on the grounds of a lack of foundation and was given additional time to review the SEC's foundation evidence. Gorsek then withdrew his foundation objection to all of these exhibits, but still objected to Exhibit 18 on relevance grounds. Exhibit 18 is a record of purchases and sales by SI customers in the stock of a company called Stone Media, Inc. None of the witnesses made any transactions in Stone Media, Inc., stock. Accordingly, the Court sustains the relevance objection. Exhibit 18 is excluded. The other exhibits are admitted into evidence.

Robert Maple testified first for the SEC. Maple has a Masters Degree in political science and Masters Degree in economics and finance. He is working on a Ph.D. in economics. Maple worked as a consultant for SA in 1995. He also attended one Board of Directors meeting for SI in 1994. Maple told Gorsek at that Board meeting that he was concerned about the disclosures in the Promotional Materials. The Promotional Materials contained the following disclaimer:

This report is for information purposes only and based on public data from sources we consider to be reliable, but is not guaranteed as to accuracy and does not purport to be complete. This report is not to be construed as a representation or as an offer or the solicitation of an offer by us to sell or buy any security. The information in this report is not intended to be used as the primary basis of investment decisions, and because of individual client objectives it should not be construed as advice designed to meet the particular investment needs of any investor. Any opinions expressed in this report are subject to change without notice. Strategic Investment Advisory, Inc., receives compensation from [name of Issuer] for providing shareholder and broker communication. This firm and/or its directors, officers, employees or others associated with it may have positions in/or effect transactions in the security or its derivatives. Annual report, 10K and other information upon request.[2]

At the meeting, Maple provided Gorsek with copies of documents produced by A.G. Edwards and Merrill Lynch to show the disclosures that those companies used. Maple was also concerned that the projections of stock price increases were inflated and were not done according to generally accepted procedures. He told Gorsek that the numbers seemed to have been pulled out of thin air.

In 1995, during the time that Maple worked as a consultant at SA, he saw Gorsek selling Issuer stock to SI brokerage customers. Gorsek sometimes wore a telephone headset when making sales calls; he occasionally walked through the SI of-

---

**2.** The Court previously determined that the Promotional Materials were false and mis-

leading even with this disclaimer. April 23, 2001, Order (d/e 149) at 17–19.

fices talking on the headset to SI brokerage customers trying to sell Issuer stock. Maple heard Gorsek's statements during some of these calls. During those calls, Maple never heard Gorsek disclose (1) the relationship between SA and SI, (2) the fact that Issuers paid compensation to SA for its services, or (3) the type or amount of compensation.[3] Maple did not participate in any of these telephone calls, and he only heard one side of the conversations. Maple also testified that Gorsek was in charge of the operations at SI and SA.

Raymond Vollantine then testified. Vollantine was a brokerage customer of SI from February 1994 to early 1995. Gorsek was his broker. Gorsek recommended that Vollantine purchase Issuer stock. Gorsek told Vollantine that he researched the Issuer companies, and based on that research, knew that the stock would increase in value. Vollantine said he relied on Gorsek in making purchases. Gorsek provided Promotional Materials to Vollantine, but Vollantine relied on Gorsek's personal recommendations rather than the written materials. Gorsek faxed some of the Promotional Materials to Vollantine. Vollantine did not read the disclaimer on the Promotional Materials.

Gorsek never disclosed to Vollantine the contractual relationship between Issuers and SA. Gorsek never explained the relationship between SA and SI to Vollantine. He thought the two were one company. Vollantine testified that he incurred a net loss of $40,000 during his transactions with Gorsek.

Dr. Christopher Archer then testified. Archer met Defendant Parks at a Christmas party in 1994. Shortly after that meeting, Archer spoke to Parks and Gorsek on a telephone conference call. Gorsek described himself during the call as an analyst who used fundamental and technical analysis to research stocks. Gorsek recommended that, based on his research, Archer purchase Issuer stock. Gorsek gave Archer projections of expected increases in value of Issuer stock prices. Archer bought the stock based on the recommendations Gorsek made during the telephone conference. Archer initially invested $50,000.

Archer may have received Promotional Materials prior to investing; he was unsure whether he received them before or after the initial investment. Archer read the Promotional Materials when he received them. The Promotional Materials were sent by fax. Gorsek did not otherwise disclose to Archer the contractual relationship between Issuers and SA. Archer testified that he sold the stock when it went down by about half.

Marcia Marr then testified. She met Parks at a social event in 1994. Shortly thereafter, she and her husband met with Parks at SI's offices. She met Gorsek at that time. Gorsek described himself as the owner of the firm. He represented that he had researched Issuer companies; based on that research, he recommended that Marr and her husband invest in Issuer companies. They invested $20,000 in Issuer stock based on Gorsek's recommendations. She did not remember the names of the stock, but her account records show that she purchased Issuer stock. The first purchase occurred on September 19, 1994. Neither Gorsek nor anyone else at SI or SA ever disclosed the contractual relationship between the Issuers and SA.

She and her husband met again with Parks in Gorsek's office one or two months after the purchase. Marr and her husband wanted to meet because the Issuer

---

**3.** These three matters are hereinafter referred to as the contractual relationship between Issuers and SI.

stock they purchased had decreased in value. At the meeting, Gorsek told her to believe in them and to ride it out. She felt that Gorsek was intimidating her; he told her that she was foolish to sell the stock. After this second meeting, she and her husband decided not to sell. Ultimately, they sold some of the stock in 1996 for $747.95. The remainder of their investment appears to be worthless at this time.

Steven Baer than testified. Baer was a SI brokerage client from October 1993 to December 1995. Gorsek was his broker. Baer learned about Gorsek through articles he read. Baer got the impression from the articles that Gorsek was a "whiz kid" who had won several competitions nationwide. Baer contacted Gorsek by telephone, and later met him in person at SI's offices. Gorsek recommended that Baer purchase Issuer stock. Over time, Gorsek recommended the stock of several Issuers to Baer. Gorsek contacted Baer by telephone or fax to make these recommendations. Gorsek consistently represented that he had talked to the president or other executive of the Issuer, and Baer needed to purchase the stock immediately because the stock was going to be a "home run." Baer bought based on Gorsek's recommendations.

Baer stated that he found out about SA late in his relationship with SI. Gorsek represented to Baer that Issuers paid SA to prepare research on the Issuers' behalf to be used in connection with public offerings of securities. Gorsek said he was providing Baer with the same research information. Gorsek did not disclose the type or amount of compensation that Issuers paid SA, or that SA was only a public relations firm which did no independent research. Gorsek never told Baer that SA would get bonuses if the stock price reached certain predetermined levels. Baer estimated that he had incurred a net loss of $90,000 to $100,000 from his investments in Issuer stock.

Lisa Countryman then testified. She and her husband attended a seminar conducted by SI. Shortly thereafter, they met with Parks and Gorsek. This was in May 1995. The meeting lasted about 30 minutes. Gorsek recommended three Issuer stocks to Countryman. Gorsek represented that he had researched these companies and was really excited about the stock. She was under the impression that Gorsek had analyzed many, many stocks before he came up with the three Issuers that he recommended to her. He told her that the stock was going up. She received Promotional Materials during the meeting, but could not remember whether she read them. At the end of the meeting, she invested $10,000 in the Issuer companies and $10,000 in mutual funds.

She testified that her net worth was $30,000 at the time she made the investment. A new account form was filled out to establish her account. The form listed her net worth at $150,000. She was not asked why that larger figure appeared on her account form. Gorsek did not disclose the contractual relationship between the Issuers and SA. She suffered a net loss of $10,500 from these investments.

Martin Dean was the last person that the SEC called to testify. He worked briefly for SI in the fall of 1994 as a part-time broker. His full-time job was selling surgical equipment. He met several physicians through this work. He planned to become a stockbroker and use his connections to develop doctors as brokerage clients. During his time at SI, however, he only secured four or five brokerage clients.

Gorsek recommended to Dean that he recommend Issuer stock to his clients. Dean believed that Gorsek had analyzed Issuers, and made his recommendations

based on his analysis. Gorsek told Dean that SA was a research firm that analyzed stocks. Dean did not know of the contractual relationship between the Issuers and SA.

Dean arranged conferences between himself, Gorsek and clients. During these conferences, Gorsek recommended that the clients purchase Issuer stock. Gorsek never disclosed the contractual relationship between the Issuers and SA during these conferences. Dean testified that he and Gorsek had such conferences with two doctors, Drs. Ansari and Kuhnke. The conference with Kuhnke was in person, and the conference with Ansari was by telephone. Dean left SI after working there for only a few months.

In addition to the testimony, the SEC submitted three lists of supervisory assignments for SI for June 1, 1993, January 1, 1994, and February 20, 1996. The June 1, 1993, list showed that Gorsek was a supervising principal for some of SI's general securities representatives, and also SI's compliance officer. The January 1, 1994, and February 20, 1996, lists state that Gorsek was the supervising principal for all purposes, and was the compliance officer.

### B. *Gorsek's Evidence*

Gorsek was not at the hearing. His counsel submitted portions of his September 11 and 12, 2000, deposition testimony in his defense. In his deposition, Gorsek stated that another SI employee, Terry Pancake, was the compliance officer for SI. Gorsek further stated that he recalled giving oral disclosures to brokerage customers informing them that SA was a public relations firm and that Issuers compensated it for producing Promotional Materials. He stated that he told customers how long SA had represented an Issuer, the identity of the Issuer personnel with whom the SA representative spoke, and what SA was

doing to increase the brokerage community's awareness of an Issuer. Gorsek said SI had a policy of making these kind of verbal disclosures to brokerage customers. The only written disclosures, however, were contained in the disclaimer on the Promotional Materials quoted above.

Gorsek said he generally provided Promotional Materials to brokerage customers before they purchased Issuer stock. Gorsek testified that he generally gave the Promotional Materials to customers personally, or personally delivered them to the customer's home or office. Gorsek testified that Issuers sometime distributed Promotional Material directly to potential investors. SA shipped Promotional Materials in bulk via United Parcel Service to Issuers for their use.

Gorsek remembered meeting with two SEC witnesses, Baer and Archer. He stated that he disclosed to both of them the relationship between SA and Issuers.

### C. *Rebuttal*

■ The SEC provided additional sworn statements of Gorsek taken on January 5, 1996, and September 12, 1997, during the SEC investigation of an Issuer, Environmental Chemicals Group, Inc. The SEC also submitted additional statements from the September 2000 Gorsek deposition. Gorsek objects to these submissions on several grounds. Gorsek argues that the SEC improperly seeks to reopen its case-in-chief to admit statements by Gorsek. He renews his argument made in his pretrial motions that the Court should exclude the investigative testimony because the SEC acted improperly to secure this testimony. He claims the statements are inadmissible hearsay. Gorsek also objects to most of the SEC's submissions on relevance grounds and lack of foundation for certain statements made in the designations. Finally he notes that the submis-

sions from the investigative testimony are not properly authenticated.

With the exceptions noted below, the Court overrules Gorsek's objections. The SEC does not seek to reopen its case-in-chief to submit additional evidence; rather, the SEC has submitted these statements properly in rebuttal to respond to the statements Gorsek submitted as evidence in his defense. The submissions are not hearsay; they are all admissions of Gorsek, a party opponent. Fed.R.Evid. 801(d)(2). The fact that Gorsek was not cross examined is irrelevant; the statements are still admissions of a party opponent. The Court will not exclude the evidence even if improperly obtained; there is no exclusionary rule in civil proceedings.[4] The SEC has now submitted Volumes I and II of the original transcripts of the investigative testimony with the original reporter's certification attached and the proofreader's certification that the transcripts are true, complete and accurate. The SEC previously submitted the original Volume III, with the original certifications, at the hearing.[5] The Court finds this certification to be sufficient to authenticate the transcripts. Fed.R.Evid. 902. The authentication objection is therefore overruled.

The SEC's designations contain relevant statements; they respond to Gorsek's statements minimizing his role as a manager at SI, his statements that he did not use the instrumentalities of interstate commerce or the mails in his dealings with SI clients, and his claims that he made oral disclosures to all SI customers. Certain pages, however, do not rebut Gorsek's submissions. The statements on pages 68:25–69:15 concerning whether Gorsek deter-mined the suitability of customers are not proper rebuttal; the objections to those statements are sustained. The statements on those pages that show that Gorsek referred SA customers to SI, however, are admissible. The objection to the references to Issuer Baywood in pages 622:22–623:18 is sustained. The statements on the pages that show the amount of disclosure Gorsek made to customers concerning compensation that Issuers paid to SA, however, are admissible. With these noted exceptions, the Court will consider the investigative testimony.

Gorsek stated in his 1996 testimony that he would on occasion call SI customers to recommend Issuer stock. Gorsek said that he prepared the disclaimer that was printed in the Promotional Materials. In his 1997 testimony, Gorsek said the Promotional Materials were sent to SI customers through the mails, although some other person in the office did the actual mailing. Gorsek said that he was the compliance officer for advertising for SI. He said that he approved any solicitations that went out. Gorsek stated that he disclosed that Issuers compensated SA, but did not give the details of the compensations. Gorsek said that no one ever asked for details.

In his deposition, Gorsek stated that he was a supervising principal of SI; he reviewed and approved transactions made by brokers. Gorsek said that there were no special procedures with respect to oral disclosures before he approved a transaction. Gorsek also said he could not remember the details about his meeting or the specifics of his conversation with Archer. Gorsek stated that he could not recall every

---

**4.** If the SEC violated Gorsek's rights, he has other remedies available to him.

**5.** The SEC submitted Volume III at the trial to authenticate Exhibit 13. The statements on page 471 contained the information to authenticate Exhibit 13. The Court retained a copy of page 471, but returned the original Volume III to the SEC at the hearing after reviewing the document's certification.

conversation with Baer, and Gorsek did not know whether he disclosed to Baer, each and every time he recommended Issuer stock, that the company was an Issuer that compensated SA.

### D. *Surrebuttal*

Gorsek submitted additional designations from the investigative testimony in reply to the SEC rebuttal. In the 1996 testimony, Gorsek stated that he did not normally refer SA customers to SI. Gorsek said he recommended Issuer stock to SI customers if the stock seemed to be undervalued and to have potential. He also offered other stocks if other stock looked better. SI customers were not automatically put on SA mailing lists. According to Gorsek, SI brokers did not normally get copies of Promotional Materials because most of their customers were more conservative investors. Gorsek said that the stock of an Issuer, Princeton Electronic, would be suitable for a speculator or aggressive investor who wants to make a high percentage return, but who is willing to take a high degree of risk.

Gorsek stated that before Promotional Materials were produced, SA collected 10-K and 10-Q reports, press releases, and informational brochures. SA representatives also spoke to Issuer officers. SA relied on this information. Gorsek stated that the disclaimer made clear that SA relied on the Issuer's information and could not guarantee the accuracy of the Promotional Materials. Gorsek said he believed SA had no independent obligation to confirm the accuracy of the statements in the Promotional Materials. Gorsek said he looked at the materials produced by public relation firms, including Financial Relations Board, to see the types of disclosures that they made.

Gorsek stated that when he recommended Issuer stock to his brokerage clients, he would disclose that he was a shareholder in SA and that SA was a public relations, investor relations or financial communications company. He would inform brokerage customers that issuers compensated SA for these services. He would not give brokerage customers Promotional Materials, but would refer them to SA if they wanted those Materials. He would put them on the SA mailing list if they wished. He instructed others to make similar disclosures. He would tell brokerage customers that the stock price projections in the Promotional Materials came from the Issuers. He would tell brokerage customers that the small cap stocks, such as Issuer stock, were extremely risky and that there was no guarantee. He would tell people to diversify their investments and hope that the big rewards would make up for any losses. Gorsek stated that he instructed Parks to disclose to brokerage customers SA's relationship with Issuers. Gorsek recalled that Parks made such disclosures to at least one brokerage customer in Gorsek's presence.

Gorsek testified that SI had a policy of not trading Issuer stock during the period before and after the publication date of SA Promotional Materials concerning the specific Issuer. Gorsek said Terry Pancake observed similar procedures in major brokerage houses. The rule was designed to create some separation between brokers and research operations. He further said SI had a policy of not distributing SA Promotional Materials or using Promotional Materials during sales presentations.

Gorsek stated that he met clients in the office occasionally. And he would recommend Issuer stock if he felt it was appropriate to meet clients' goals. He said sales of Issuer stock represented 5 to 10 percent of his brokerage sales. Gorsek said that there was no correlation between the time when SA signed a new Issuer client and

when he recommended that Issuer's securities. He said that he did not try to drum up business for Issuer stock when the Issuers signed with SA. He said this was not a policy or goal.

Gorsek said that Issuers demanded that their agreements with SA contain incentives under which SA received additional stock when the Issuer's stock price reached certain levels. Gorsek said that SA wanted to receive a flat fee for the services, but the Issuers wanted to build incentives into the arrangement because of bad experiences with past public relation firms that did not do the work. The incentives provided a means to measure the effectiveness of the services.

Gorsek said that he satisfied himself that the Promotional Materials were within appropriate standards and guidelines by comparing them to other public relation companies' publications and by reviewing federal and state statutes.

## V. ANALYSIS

Based on the evidence presented, the Court finds in favor of the SEC on each issue identified in the pretrial order.

### A. Use of Mails and Instrumentalities of Interstate Commerce

■ Gorsek used the instrumentalities of interstate commerce and the mails. He stated in his investigative testimony that Promotional Materials were mailed to SI brokerage customers. Archer testified that Gorsek participated in a telephone conference in which Gorsek recommended Issuer stock. Baer stated that Gorsek faxed Promotional Materials to him. Maple observed Gorsek using the telephone to solicit brokerage customers to purchase Issuer stock. Dean participated in at least one telephone conference in which Gorsek

recommended the purchase of Issuer stock to a brokerage customer. The Court finds Gorsek's statements in his deposition that he only met with people in person and only hand delivered Promotional Materials to brokerage customers not to be credible.[6] Gorsek used means of interstate commerce and the mails in connection with the offer to sell Issuer securities to SI brokerage clients.

### B. Provision of Promotional Materials to SI Customers and Oral Disclosures

Gorsek provided SI brokerage customers with Promotional Materials, but he did not make additional disclosures which would render the materials no longer materially false or deceptive. The Court already determined that the Promotional Materials contained material misrepresentations. Gorsek did not make additional oral disclosures concerning the type and amount of compensation received by SA for production of the Promotional Materials. Gorsek did not disclose that SA's opinions and recommendations were made under the direction or approval of the Issuer and contained no independent research by SA. Only Baer received any disclosures about SA, but even those disclosures were false and deceptive. Gorsek told Baer that SA produced research materials to be used in connection with public offerings. That was untrue. SA did no research; it produced ads, nothing more.

Gorsek's statements that he made oral disclosures and did not distribute Promotional Materials to SI brokerage clients are not credible. His statements are contradicted by every other witness. Gorsek, himself, stated in his deposition that he gave Promotional Materials to brokerage customers before the customers purchased

---

6. Gorsek, himself, admitted that he sent Promotional Materials through interstate commerce, by UPS, to Issuers for redistribution to potential stock purchasers, including possibly SI customers.

Issuer stock. Gorsek distributed Promotional Materials to brokerage clients and did not make additional oral disclosures that rendered the Promotional Materials no longer materially false or deceptive.

#### C. *Additional Misrepresentations*

Gorsek made additional misrepresentations to brokerage customers in connection with the sale of Issuer stock. Every brokerage customer testified that Gorsek represented that he based his recommendations on his own research of the Issuers. He told Archer that he used technical and fundamental analysis. He implied to Countryman that he researched many, many companies before selecting the three that he recommended to her. He told Dean that SA was a research firm. All of these statements were lies. He did not conduct research. He just said whatever the Issuers paid him to say. Gorsek's statements to the contrary are not credible.

#### D. *Scienter*

Gorsek acted with scienter. Scienter may be shown through knowing or reckless conduct. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977). Reckless conduct means a "highly unreasonable" misrepresentation or omission, "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand*, 553 F.2d at 1045. Gorsek knew that he did not conduct independent research of Issuers; yet he told brokerage customers that he did so, and further told them to rely on that nonexistent research to purchase Issuer stock. He lied about being a research analyst, and he knew that he was lying.

Gorsek appears to be claiming that he somehow innocently relied on Terry Pancake as the compliance officer. These claims also are not credible. Gorsek stated in the investigative testimony that he was the compliance officer for advertising for SI. The lists of supervisory assignments show that he was the compliance officer, not Pancake. Further, the exhibits show that Gorsek in 1993 was a supervising principal of some of the brokers. In 1994 and 1996, he was the only supervising principal at SI. Maple and Dean both testified that Gorsek was in charge of the operation. Gorsek told Marr that he was the owner. Gorsek was in charge; he did not rely on anyone else.

Gorsek also states that he believed that the Promotional Materials met appropriate standards by comparing them to publications by other public relation firms and based on his review of federal and state laws. The Court does not find these statements to be credible. The Court previously determined in its Order entered April 23, 2001, that Gorsek knew that the Promotional Materials contained material misrepresentations and omissions. His statements to the contrary are not credible. Further, Gorsek compounded the deceptive statements in the Promotional Materials by knowingly and falsely stating to brokerage customers that he independently researched Issuer stock. He acted with scienter.

THEREFORE, the Court finds in favor of the SEC and against Gorsek as to liability on Counts III and IV of the Complaint. This matter will proceed on the schedule set forth in this Court's minute entry of April 16, 2002.

IT IS THEREFORE SO ORDERED.