# Firearms Disabilities of Nonimmigrant Aliens Under the Gun Control Act

The prohibition in 18 U.S.C. § 922(g)(5)(B) of shipping, transporting, possessing, or receiving any firearm or ammunition that has a connection to interstate commerce applies only to nonimmigrant aliens who must have visas to be admitted to the United States, not to all aliens with nonimmigrant status. The text of the statute forecloses the interpretation advanced by the Bureau of Alcohol, Tobacco, Firearms and Explosives in an interim final rule applying section 922(g)(5)(B) to all nonimmigrant aliens.

October 28, 2011

MEMORANDUM OPINION FOR THE CHIEF COUNSEL
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

A provision of the federal Gun Control Act prohibits any "alien" who has "been admitted to the United States under a nonimmigrant visa" from shipping, transporting, possessing, or receiving "any firearm or ammunition" that has a connection to interstate commerce. 18 U.S.C. § 922(g)(5)(B) (2006). In 2002, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") issued an interim final rule interpreting this prohibition to apply to any alien who has the status of "nonimmigrant alien," regardless of whether the alien required a visa in order to be admitted to the United States. *See* 27 C.F.R. § 478.32(a)(5)(ii) (2011). In March 2011, in response to a request for informal advice regarding ATF's interpretation, we concluded that the text of the statute forecloses that interpretation. We explained that the text is clear: the provision applies only to nonimmigrant aliens who must have visas to be admitted, not to all aliens with nonimmigrant status. In May 2011, you requested a formal opinion from the Office on this matter.[1] This memorandum memorializes and elaborates upon the informal advice we provided in March. In the course of formalizing our advice, we received views from the Department of Homeland Security ("DHS"),[2] which also concluded that the

---

[1] *See* Memorandum for the Office of Legal Counsel from Stephen R. Rubenstein, Chief Counsel, Bureau of Alcohol, Tobacco, Firearms and Explosives (May 11, 2011) ("ATF Memorandum").

[2] *See* Letter for Cristina M. Rodríguez, Deputy Assistant Attorney General, Office of Legal Counsel, from Seth Grossman, Chief of Staff, Office of the General Counsel, Department of Homeland Security (July 20, 2011) ("DHS Letter"). We also received

interpretation reflected in ATF's interim final rule conflicts with the plain text of the statute.

## I.

Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–931), to "establish[] a detailed federal scheme" to govern "the distribution of firearms," *Printz v. United States*, 521 U.S. 898, 902 (1997). Congress also prescribed criminal and civil penalties for knowing violations of the statute's provisions. *See* 18 U.S.C. § 924(a)(2) (2006) ("Whoever knowingly violates subsection . . . (d) [or] (g) . . . of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."). The concerns animating the legislation included the need to address "the widespread traffic in firearms" and the "general availability" of firearms to persons "whose possession thereof was contrary to the public interest." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 364 (1984) (internal quotation marks omitted); *see also Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of the 1968 Act reflects a . . . concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

As part of the Act's scheme, Congress laid out various so-called "prohibitors" to identify the categories of people barred from possessing, shipping, transporting, or receiving firearms. *See* 18 U.S.C. § 922(h) (Supp. IV 1968). These prohibitors are now codified in 18 U.S.C. § 922(g) (2006). In 1998, Congress added the prohibitor here at issue to the statute: section 922(g)(5)(B) bars "aliens"[3] who have "been admitted

---

views from the Federal Bureau of Investigations ("FBI"). *See* E-mail for Cristina M. Rodríguez, Deputy Assistant Attorney General, Office of Legal Counsel, from Scarlett Everly, National Instant Criminal Background Check System Bureau of Investigation, Federal Bureau of Investigation (June 13, 2011) (noting that when a Federal Firearms Licensee provides the FBI with information that a prospective purchaser has indicated he or she is a non-U.S. citizen, the FBI searches DHS records to determine if the potential purchaser is an unlawful or nonimmigrant alien and processes firearm background checks in line with ATF's interpretation of 18 U.S.C. § 922(g)(5)(B)).

[3] The original Gun Control Act did not contain a prohibitor applicable to aliens. Congress first adopted that prohibition in title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. app. § 1202(a) (Supp. IV 1968), barring possession by

to the United States under a nonimmigrant visa" from possessing, shipping, transporting, or receiving firearms. Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, 112 Stat. 2681 (codified at 18 U.S.C. § 922(g)(5)(B)).[4]

In 2002, ATF adopted an interim final rule implementing section 922(g)(5)(B). *See Implementation of Public Law 105-277, Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Relating to Firearms Disabilities for Nonimmigrant Aliens, and Requirement for Import Permit for Nonimmigrant Aliens Bringing Firearms and Ammunition Into the United States (2001R-332P)*, 67 Fed. Reg. 5422 (Feb. 5, 2002) (temporary rule, Treasury decision).[5] ATF interpreted the prohibitor to include all aliens with the status of nonimmigrant alien, not just those nonimmigrants who required a visa to be admitted to the United States. In explaining this interpretation, ATF acknowledged that section 922(g)(5)(B) applied by its terms to "aliens admitted to the United States under a nonimmigrant visa," but also determined that such a visa "simply facilitates travel and expedites inspection and admission to the United States," and "does not itself provide nonimmigrant status." *Id*. at 5422. Based on this observation, as well as its view that drawing distinctions among different types of nonimmigrant aliens was neither rational nor supported by the legislative history, ATF concluded that Congress intended the prohibitor to cover all persons with nonimmigrant alien status, *see id.*, and issued its interim final rule. *See* 27 C.F.R. § 478.32(a)(5)(ii); *see id.* § 478.11 (defining "nonimmigrant alien"). ATF has since understood

"'alien[s]'" who are "'illegally or unlawfully in the United States,'" *United States v. Bass*, 404 U.S. 336, 337 n.1 (1971). In 1986, Congress repealed title VII and added a firearms disability for aliens who are "illegally or unlawfully in the United States" to 18 U.S.C. § 922. *See* Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449, 457 (1986).

[4] Section 922(y)(2) lists various exceptions to the prohibition in section 922(g)(5)(B), and section 922(y)(3) sets out a waiver procedure for aliens subject to the requirements of section 922(g)(5).

[5] ATF issued the interim rule before Congress transferred ATF from the Department of the Treasury to the Department of Justice through the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. *See* 6 U.S.C. § 531(c) (2006); 28 U.S.C. § 599A(c)(1) (2006). Congress originally delegated rulemaking authority to implement the Gun Control Act to the Secretary of the Treasury but, due to the transfer, such rulemaking authority now resides in the Attorney General. *See* 18 U.S.C. § 926(a) (2006).

section 922(g)(5)(B) to apply to all aliens with nonimmigrant status, including nonimmigrant aliens admitted to the United States without a visa, pursuant either to the Visa Waiver Program, *see* 8 U.S.C. § 1187 (2006), or to regulations otherwise exempting them from visa requirements.[6]

## II.

You have asked whether ATF's interim rule permissibly construes section 922(g)(5)(B). Our analysis of the provision "begin[s], as always, with the text of the statute." *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 173 (2009) (internal quotation marks omitted). In our view, the text of the statute is clear and forecloses ATF's interpretation. Section 922(g)(5)(B) makes it unlawful for aliens who have been "admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26))" to ship, transport, possess, or receive any firearms or ammunition. 18 U.S.C. § 922(g)(5)(B). Section 101(a)(26) of the Immigration and Nationality Act ("INA"), in turn, defines a "nonimmigrant visa" as "a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter." 8 U.S.C. § 1101(a)(26) (2006). The text of section 922(g)(5)(B), read in accord with section 101(a)(26) of the INA, therefore makes it a crime for an alien who has been "issued" a "visa . . . as an eligible nonimmigrant by a competent officer" to ship, transport, possess, or receive any firearm or ammunition.[7]

---

[6] By statute, the Attorney General and the Secretary of State are authorized to establish a Visa Waiver Program under which a nonimmigrant alien may seek a waiver of the visa requirement if, among other things, he or she seeks entry "for a period not exceeding 90 days"; is "a national of, and presents a passport issued by, a country which . . . extends . . . for immigration admissions, reciprocal privileges to citizens and nationals of the United States"; and "has been determined not to represent a threat to the welfare, health, safety, or security of the United States." 8 U.S.C. § 1187(a)(1), (2), (6) (2006). In addition, the visa requirement has been waived by regulation for certain categories of foreign nationals, including nationals from particular countries, such as Canada and Mexico, seeking admission to the United States for particular purposes. *See* 22 C.F.R. § 41.2(a), (g) (2011).

[7] Section 922(d)(5) similarly makes it unlawful to sell or dispose of a firearm or ammunition to "an alien" who "has been admitted to the United States under a nonimmigrant

Nothing in this statutory text indicates that the prohibition applies to persons simply by virtue of their status as nonimmigrants. The statute instead requires that the covered nonimmigrant possess a visa. ATF's interim rule thus reads a key limiting phrase—"admitted . . . under a nonimmigrant visa"—out of the statute, in contravention of bedrock principles of statutory interpretation. *See, e.g.*, *Fid. Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 163 (1982) (declining to construe a statute "so as to render [certain] provisions nugatory, thereby offending the well-settled rule that all parts of a statute, if possible, are to be given effect") (internal quotation marks omitted); *see also* DHS Letter at 5–8 (noting that ATF's interpretation finds support in neither ordinary linguistic practices nor case law).

ATF suggests that the text of section 922(g)(5)(B) is "inaccurate and ambiguous" because nonimmigrant aliens are not actually "'admitted under'" a visa. ATF Memorandum at 2. Instead, a visa merely "expedites admission to the United States by showing that the State Department found the person to be admissible." *Id.* According to ATF, it then "is up to the immigration officer at the port of entry to determine if the individual is in fact admissible and, if so, under what terms and conditions and in what category." *Id.*

Though DHS indicates that ATF accurately describes the admissions process, *see* DHS Letter at 7, that description does not support ATF's reading of section 922(g)(5)(B). As a matter of ordinary usage, the process to which ATF refers could be described as admission "under a nonimmigrant visa" because the nonimmigrant must present the visa when seeking admission. As DHS emphasizes, *see* DHS Letter at 7–8, courts have employed language similar to that contained in the statutory provision when describing different categories of aliens, underscoring that "admitted . . . under a nonimmigrant visa" can be used in a non-technical sense to refer to the particular subclass of nonimmigrant aliens admitted with a visa. *See, e.g.*, *Phal v. Mukasey*, 524 F.3d 85, 87 (1st Cir. 2008) (noting an alien "entered the United States on a nonimmigrant visa");

---

visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26))." 18 U.S.C. § 922(d)(5) (2006). Because ATF has requested our view on the meaning of section 922(g)(5)(B) only, our opinion is limited to that subsection, but our analysis would likely apply to section 922(d)(5), provided no relevant differences between that provision and section 922(g)(5)(B) exist.

*Choe v. INS*, 11 F.3d 925, 943 (9th Cir. 1993) ("Before 1960, the Attorney General had three options when faced with an adjustment application from an alien who entered under a nonimmigrant visa[.]"). Moreover, "[i]mmigration law draws a distinction between aliens in possession of a nonimmigrant visa and those who have been admitted in a nonimmigrant classification." DHS Letter at 5. The statutory reference to nonimmigrants "admitted . . . under a nonimmigrant visa" therefore has a clear meaning here: it indicates that Congress intended the firearms disabilities in section 922(g)(5)(B) to apply only to a subset of nonimmigrants—namely those who possess a "nonimmigrant visa"—whatever that visa's function.[8]

ATF also justifies its interpretation of the statutory text on the ground that applying the prohibitor to only a particular subset of nonimmigrants would produce "irrational" results, because "[t]here is no logical reason nonimmigrants with nonimmigrant visas should have a firearms disability, if nonimmigrants without visas do not have the disability." ATF Memorandum at 4. Although an established canon of statutory construction might permit departure from the literal meaning of statutory text where such a reading would produce "positively absurd" results, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994), the literal meaning of section 922(g)(5)(B) is far from absurd. Indeed, the Supreme Court recently has emphasized that "it is not this Court's task to decide whether the statutory scheme established by Congress is unusual or even bizarre." *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2582 (2011) (internal quotation marks omitted).

Although the text of the statute does not include an express rationale for the distinction drawn between nonimmigrants with visas and those without, it is not difficult to discern a rational basis for the distinction. DHS has told us, for example, that applying the prohibitor to nonimmigrant aliens in a limited fashion, "while not ideal . . . would not be irra-

---

[8] DHS also observes that Congress would have been fully aware of the existence of categories of nonimmigrants who did not require visas to be admitted to the United States when it enacted section 922(g)(5)(B). The Visa Waiver Program had been in effect for twelve years at the time Congress debated section 922(g)(5)(B), and Canadian and Mexican nationals in possession of border crossing cards had long been permitted to enter the United States without a nonimmigrant visa. *See* DHS Letter at 7; *see also Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").

tional," as it is possible that Congress considered those aliens eligible for admission to the United States without a nonimmigrant visa to be a "lesser security risk" than aliens admitted with visas. DHS Letter at 8–9. After all, Congress has tied the decision whether to waive visa requirements to judgments about a waiver's effects on public safety, and Congress here could have concluded that nonimmigrant aliens who do not require visas do not present the public safety risks that warrant prohibiting their acquisition of firearms. *See id.* at 8.[9]

Other factors may also explain why Congress decided to treat nonimmigrant aliens eligible for visa waivers differently from nonimmigrant aliens admitted under visas. For example, nonimmigrants admitted under the Visa Waiver Program may well spend less time in the country than other nonimmigrants, *see* 8 U.S.C. § 1187(a)(1) (2006) (imposing 90-day limit on aliens admitted under Visa Waiver Program), perhaps making them less likely to purchase firearms. Congress also could have thought that imposing criminal firearms prohibitions on nonimmigrant aliens admitted under the program would frustrate the objectives of the program, which include reducing barriers to and burdens upon travel. *See* Department of State, Visa Waiver Program (VWP), http://travel.state.gov/visa/temp/without/without_1990.html (last visited Oct. 21, 2011) ("The program was established to eliminate unnecessary barriers to travel, stimulating the tourism industry, and permitting the Department of State to focus consular resources in other areas.").

Congress (or some members thereof) ultimately could have had all, some, or none of these considerations in mind. Whatever Congress's motivation, these rationales demonstrate that it would have been rational for Congress to draw a statutory line between nonimmigrants with visas

---

[9] DHS cites 8 U.S.C. § 1187(c)(2)(C), which provides that a country will not be eligible for the Visa Waiver Program unless the Secretary of Homeland Security "evaluates the effect that the country's designation would have on the law enforcement and security interests of the United States." *See also id.* § 1187(c)(2)(F) (Supp. IV 2010) (requiring participating countries to share information regarding safety risks); Department of State, Visa Waiver Program (VWP), http://travel.state.gov/visa/temp/without/without_1990.html (last visited Oct. 21, 2011) ("To be admitted to the Visa Waiver Program, a country must meet various security and other requirements, such as enhanced law enforcement and security-related data sharing with the United States and timely reporting of both blank and issued lost and stolen passports. VWP members are also required to maintain high counterterrorism, law enforcement, border control, and document security standards.").

and those without, such that the plain meaning of the text is not absurd. ATF may be correct that the firearms disabilities in section 922(g)(5)(B) should be applied to all nonimmigrant aliens "as a matter of sound public policy" or administrative convenience. ATF Memorandum at 4. But any debate over whether the current statute is deficient as a policy matter ultimately "belongs in the halls of Congress." *Powerex Corp. v. Reliant Energy Servs.*, 551 U.S. 224, 237 (2007).

ATF next turns to legislative history to support its position. ATF first points to two floor statements made by members of Congress during the debate over section 922(g)(5)(B): a statement by Senator Richard Durbin that a restriction on gun possession should apply to persons who "'come into this country as our guest, not as a citizen of the United States,'" and a statement by Senator Larry Craig supporting restrictions on gun possession by persons "'who are guests in our country, legally or illegally.'" ATF Memorandum at 2 (quoting 144 Cong. Rec. 16,493–94 (1998)). From these statements, ATF concludes that Congress intended the gun control prohibition to apply to all nonimmigrant aliens, regardless of visa status.

Because the text of the statute is clear, any resort to legislative history in this context is unnecessary. *See*, *e.g.*, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (internal quotation marks omitted)); *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."). What is more, floor statements are generally of limited interpretive assistance as they "reflect at best the understanding of individual Congressmen." *Zuber v. Allen*, 396 U.S. 168, 186 (1969). Indeed, we think it unlikely that even unambiguous floor statements by a few members of Congress could ever overcome the plain meaning of a statute. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 457 (2002) ("Floor statements from two Senators cannot amend the clear and unambiguous language of a statute.").

In any event, neither of the floor statements speaks directly to the interpretive issue addressed here. Neither uses the term "nonimmigrants." Each statement refers instead to "guests" or a person who enters the country "not as a citizen" of the United States. The plain meaning of these references, particularly the reference to non-citizens, encompasses all

immigrants, including lawful permanent residents—immigrants who neither ATF nor the legislative record suggests are covered by section 922(g)(5)(B). Thus, two Senators' use of the references "guest[]" and person who enters "not as a citizen" during a floor debate provides little, if any, insight into the meaning of the statutory phrase "nonimmigrants . . . admitted under a visa." *Cf. Aaron v. SEC*, 446 U.S. 680, 697 (1980) ("it would take a very clear expression in the legislative history of congressional intent to the contrary to justify the conclusion that the statute does not mean what it so plainly seems to say").[10]

ATF also highlights a floor statement from the debate over a later-enacted statutory provision—an explosives prohibition contained in the Homeland Security Act of 2002. *See* ATF Memorandum at 4. During that legislative debate, a section-by-section analysis was introduced into the record explaining that the prohibition would apply to "aliens other than lawful permanent resident aliens" and that the provision "brings the explosives law in line with most categories of prohibited people in the Gun Control Act." 148 Cong. Rec. 22,985 (2002) (noting also that "[t]he language relating to non-immigrant aliens differs slightly from that in the Gun Control Act, as technical changes have been made to improve the clarity of the provisions"). ATF's argument appears to be that (i) because a sectional analysis accompanying the explosives statute stated that the statute would bring the law into line with the Gun Control Act; (ii) because the explosives provision clearly applied to all aliens other than lawful permanent residents, including all nonimmigrant aliens; and (iii) because the only difference in the language of the definitions of the two statutes was "technical," Congress must have intended the Gun Control Act to apply to all nonimmigrant aliens. *See* ATF Memorandum at 4.

---

[10] Although it is unnecessary to our statutory analysis, we note that elements of the legislative history reinforce the plain meaning of the text. The legislative record suggests that the prohibition in section 922(g)(5)(B) was added in response to a shooting by "a resident of the Nation of Lebanon" who had come "to the United States on a nonimmigrant visa, such as a tourist visa." 144 Cong. Rec. 16,493 (1998). Furthermore, the principal sponsor of the bill, Senator Durbin, used the term "nonimmigrant visa" six times in the course of a short floor statement discussing the need for the prohibition. *See id.* This legislative history suggests that Congress drafted section 922(g)(5)(B) to apply to nonimmigrants admitted under a visa for the simple reason that it was that category of nonimmigrant aliens Congress had in mind in enacting the bill.

This argument rests not on the legislative history of the Gun Control Act, but on the history of a subsequently enacted statute. Like broad statements from individual members of Congress, such evidence provides only limited support for a statutory reading that is inconsistent with the text. The history of later-enacted statutes generally does not provide reliable evidence of the intent of the Congress that enacted an earlier provision. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 840 (1988) ("The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") (internal quotation marks omitted). For these reasons, we do not believe the legislative history of the explosives statute sheds light on the meaning of section 922(g)(5)(B).

### III.

You also have asked us what actions ATF would be legally required to take with respect to past or pending criminal cases in the event that section 922(g)(5)(B) does not apply to all nonimmigrant aliens. *See* ATF Memorandum at 5. The necessary implication of our conclusion here is that section 922(g)(5)(B) does not authorize future or pending investigations and prosecutions predicated on the view that the statute applies to all nonimmigrant aliens, regardless of visa status. Although we are not aware of any legal obligations ATF or the Department might have to seek the vacatur of any past criminal convictions, we note that the Criminal Division possesses substantial expertise on the relevant legal rules and Department practices in such circumstances.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*